Amy E. Davis (*pro hac vice pending*)
LAW CENTER OF AMY E. DAVIS, LLC
1021 N. Bishop Ave.
Dallas, TX 75208
Telephone: (214) 838-3501
adavis@cdfirm.com

Steve Calamusa (*pro hac vice pending*)
Geoff S. Stahl (*pro hac vice pending*)
Rachel Bentley (*pro hac vice pending*)
Gordon & Partners, P.A.
4114 Northlake Blvd.
Palm Beach Gardens, FL 33410
Telephone: 561-799-5070
SCalamusa@fortheinjured.com
GStahl@fortheinjured.com
RBentely@fortheinjured.com

DAVID E. ROSEN (SBN 155385)
Email: drosen@murphyrosen.com
MURPHY ROSEN LLP
100 Wilshire Boulevard, Suite 1300
Santa Monica, California  90401-1142
Telephone:  (310) 899-3300
Facsimile:  (310) 399-7201

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHELLE ALBAHAE, MEGAN ARCADI, JESSICA AURIANA, JOANNE BROWN, MACKENZIE COGLE, ROBIN DANIELS, ROXANNA DE LA CRUZ, BRIANDA EARLE, LAUREN HUDSON, TIFFANY HUVAL, KAT JOHNSTON, EUNICE KAHLER, ANNA KURILOVA, LESLIE MCDONALD, LESLIE ORR, SYLVA PATE, NICOLE QUENGA, MELINDA QUINN, NATALIE REGISTER, SARAH RICHARDSON, AMY SHAY, DEBRA STERLACCI, MIECHA ISYS THOMAS, LESLIE TOLSTOY, | CASE NO. _____<br><br>**ORIGINAL COMPLAINT:**<br><br>1. **BREACH OF EXPRESS WARRANTY**<br>2. **BREACH OF IMPLIED WARRANTY**<br>3. **VIOLATION OF CALIFORNIA CONSUMER PROTECTION AND FALSE ADVERTISING LAWS**<br>4. **NEGLIGENCE/GROSS NEGLIGENCE – DANGEROUS DESIGN, FAILURE TO WARN/INSTRUCT AND FAILURE TO TEST** |

1

**ALEXANDRA URRESTI, REBEKAH VALENTINE, ROBIN YEAGER and MAUREEN ZAVATONE**

     **Plaintiffs,**

    **v.**

**OLAPLEX HOLDINGS, INC. AND COSWAY CO., INC.,**

    **Defendants.**

)
)
)
)

**5. PRODUCT LIABILITY/STRICT PRODUCT LIABILITY – DESIGN, WARNING/INSTRUCTION AND TEST DEFECTS**

**DEMAND FOR JURY TRIAL**

Plaintiffs Michelle Albahae, Megan Arcadi, Jessica Auriana, Joanne Brown, Mackenzie Cogle, Robin Daniels, Roxanna De la Cruz, Brianda Earle, Lauren Hudson, Tiffany Huval, Kat Johnston, Eunice Kahler, Anna Kurilova, Leslie McDonald, Leslie Orr, Sylva Pate, Nicole Quenga, Melinda Quinn, Natalie Register, Sarah Richardson, Amy Shay, Debra Sterlacci, Miecha Isys Thomas, Leslie Tolstoy, Alexandra Urresti, Rebekah Valentine, Robin Yeager and Maureen Zavatone (collectively, "Plaintiffs") file this Original Complaint against Defendant Olaplex Holdings, Inc. and Cosway Co., Inc. (collectively, "Defendants") and respectfully state as follows:

## NATURE OF THE ACTION

1.    Plaintiffs have sustained personal and economic injury in connection with and as a result of their purchase and use of Olaplex hair care products, including, but not limited to Olaplex No. 0, No. 1, Olaplex No. 2, Olaplex No. 3,

Olaplex No. 4, Olaplex No. 5, Olaplex No. 6, Olaplex No. 7, Olaplex No. 8 and Olaplex No. 9 (the "Products"). Defendants jointly designed and manufactured the Products Defendant Olaplex Holdings, Inc. ("Olaplex") marketed, distributed and sold the Products.

2.      By this action, Plaintiffs seek redress for their personal injuries, primarily to their hair and scalp. Plaintiffs also seek redress for, and to stop, Defendant's unfair, false and deceptive advertising and marketing of the Products.

## JURISDICTION AND VENUE

3.      The Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332(a), because this is a lawsuit in which over $75,000 is at issue and Plaintiffs are citizens of states other than Defendant's states of citizenship.

4.      This Court also has personal jurisdiction over Olaplex because Olaplex maintains its principal place of business in the District and has continuous, systematic, and substantial contacts within this District and California. Further, Olaplex has committed unlawful and tortious acts in this District and California that it knew or should have known would cause injury to Plaintiffs—acts which give rise to the causes of action asserted in this lawsuit. Olaplex engages in the wrongdoing alleged in this Complaint throughout the United States, including California and Defendant's Products are advertised, marketed, distributed, and sold throughout this District and across the State of California. Defendant is authorized to do business in

3

California and has sufficient minimum contacts with California and/or otherwise has intentionally availed itself of the laws and markets of California, rendering the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. Moreover, Olaplex engages in substantial and regular activity within California.

5.     This Court also has personal jurisdiction over Cosway because Cosway is incorporated in California, maintains its principal place of business in California and otherwise avails itself of the privilege of doing business in this District and California.

6.     Venue is proper pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to the claims asserted in this Complaint occurred in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(c) because Defendants (1) conduct substantial business in this District, including, but not limited to, a) the design and manufacture of the Products; b) compilation and evaluation of data to inform its advertising and promotional campaigns; c) solicitation and engagement of retailers, hair salons, hair stylists, influencers, Products ambassadors and paid celebrity endorsers; d) testing of the Products; and e) sale of the Products, (2) have sufficient minimum contacts with this District, and (3) otherwise purposely avail themselves of the privilege of conducting business in this District, through the promotion, sale, and marketing of the Products in this District.

## PARTIES

7.    Plaintiff Michelle Alabahae is a citizen of Florida, residing in Tamarak, Florida.

8.    Plaintiff Megan Arcadi is a citizen of Florida, residing in St. Petersburg, Florida.

9.    Plaintiff Jessica Auriana is a citizen of New York, residing in Poughkeepsie, New York.

10.    Plaintiff Joanne Brown is a citizen of England, residing in Tadley Hampshire, England.

11.    Plaintiff Mackenzie Cogle is a citizen of Alabama, residing in Birmingham, Alabama.

12.    Plaintiff Robin Daniels is a citizen of Texas, residing in League City, Texas.

13.    Plaintiff Roxanna De la Cruz is a citizen of Texas, residing in Edinburg, Texas.

14.    Plaintiff Brianda Earle is a citizen of Indiana, residing in Albion, Indiana.

15.    Plaintiff Lauren Hudson is a citizen of Virginia, residing in Salem, Virginia.

16.    Plaintiff Tiffany Huval is a citizen of Louisiana, residing in Abbeville,

Louisiana.

17.    Plaintiff Kat Johnston is a citizen of Hawaii, residing in Kihei, Hawaii.

18.    Plaintiff Eunice Kahler is a citizen of Missouri, residing in Springfield, Missouri.

19.    Plaintiff Anna Kurilova is a citizen of Arizona, residing in Mesa, Arizona.

20.    Plaintiff Leslie McDonald is a citizen of Kansas, residing in Overland Park, Kansas.

21.    Plaintiff Leslie Orr is a citizen of Utah, residing in Hurricane, Utah.

22.    Plaintiff Sylva Pate is a citizen of New York, residing in Yonkers, New York.

23.    Plaintiff Nicole Quenga is a citizen of Arizona, residing in Phoenix, Arizona.

24.    Plaintiff Melinda Quinn is a citizen of Vermont, residing in Bomossenn, Vermont.

25.    Plaintiff Natalie Register is a citizen of New York, residing in Ridgewood, New York.

26.    Plaintiff Sarah Richardson is a citizen of North Carolina, residing in Greensboro, North Carolina.

27.    Plaintiff Amy Shay is a citizen of Pennsylvania, residing in Bethel Park,

Pennsylvania.

28.     Plaintiff Debra Sterlacci is a citizen of New York, residing in Babylon, New York.

29.     Plaintiff Miecha Isys Thomas is a citizen of New York, residing in Brooklyn, New York.

30.     Plaintiff Leslie Tolstoy is a citizen of Oregon, residing in McMinnville, Oregon.

31.     Plaintiff Alexandra Urresti is a citizen of Idaho, residing in Middleton, Idaho.

32.     Plaintiff Rebekah Valentine is a citizen of Texas, residing in Boerne, Texas.

33.     Plaintiff Robin Yeager is a citizen of Ohio, residing in Broadview Heights, Ohio.

34.     Plaintiff Maureen Zavatone is a citizen of Connecticut, residing in Old Saybrook, Connecticut.

35.     Olaplex is a Delaware corporation with its principal place of business in California. Olaplex may be served through its registered agent, JuE Wong, President, Olaplex Holdings, Inc., at 1187 Coast Village Rd, Suite 1-520, Santa Barbara, CA 93108.

36.     Cosway is a California corporation with its principal place of business

in California. It may be served through its registered agent, Richard L. Hough, Chief Executive Officer, Cosway Co, Inc., 20633 S Fordyce Ave., Carson, CA 90810.

## FACTUAL BACKGROUND

37.     Olaplex and Cosway designed and manufactured the Products. Olaplex marketed, sold and distributed the Products throughout the world at all times relevant to this Complaint.

38.     When it comes to beauty products sold in the U.S., there is an absence of regulation setting standards for the use of formaldehyde and similar allergens and the U.S. Food and Drug Administration ("FDA") has little authority.[1] The law does not require cosmetic companies to share formulae, testing or adverse event information with the FDA—before or after the product is placed on the market. Consumers have no choice but to depend on the product makers and sellers to honestly represent their products and ensure consumer safety.

39.     Defendants have failed to protect consumers by making false claims about the Products and by failing to ensure the Products are safe.

**False Claims About the Products**

40.     Defendants design and market the Products as hair care products primarily for consumers with dry and damaged hair or hair. More particularly,

---

[1]   *See*   https://www.fda.gov/cosmetics/cosmetics-laws-regulations/fda-authority-over-cosmetics-how-cosmetics-are-not-fda-approved-are-fda-regulated

Olaplex, which is headquartered in Los Angeles County, California, makes the following representations concerning the Products on its website, in social media, such as Facebook and Instagram, and in other marketing materials aimed at consumers as well as in literature and sales materials its provides to retailers, hair salons, hair stylists, influencers, brand ambassadors, paid celebrity endorsers and others it engages to promote and sale the Products: (1) "restore[] damaged and compromised hair," (2)  create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, DEA, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!"[2]

41.    By repeating these claims over and over on its website, in social media pages and sponsored placement ads online and in magazines, Defendants bank on the psychological concept known as the "illusion of truth."  The more you repeat a claim, the more likely your audience is to believe it is true.

42.    In fact, the Products are none of these things.

**Design Defects of the Products**

43.    In addition to making false claims about the Products, Defendants have

---

[2]    www.olaplex-me.com/faq.php;        https://olaplex.com/pages/how-it-works**;** https://youtu.be/fEboj5Rdczg?t=107**;**    and    https://olaplex.com/pages/frequently-asked-questions**.**

failed to adhere to minimum standards for the cosmetic industry in the way they design the Products.

44.    Multiple varieties of the Products, including No. 3, contain or have until recently contained lilial, an ingredient that, according to a recorded Instagram video featuring Lavinia Popescu, Olaplex Chief Scientist, VP R&D + Regulatory, Olaplex knew to be a sensitizer and allergen.[3] Many more of the Products contain panthenol and other ingredients known for some time by the beauty industry to be allergens and irritants. These sorts of ingredients lead to allergic contact dermatitis ("ACD") and resulting hair loss and scalp injuries.

45.    Olaplex's use of lilial has even more serious implications. Olaplex sells the Products worldwide. In 2020, the European Union Scientific Committee on Consumer Safety ("SCCS") demanded lilial be phased out of use in hair and beauty products by March 2022. Our review of archived websites shows that Sephora removed lilial from the No. 3 ingredient list in approximately June 2021. This indicates that, as early as 2020 or early 2021, Sephora required Olaplex to remove lilial in those Products sold to Sephora. Nevertheless, according to its own public statements, Olaplex did not remove the ingredient more generally in Products sold in the US and EU until February 2022.

---

[3]    Embedded at https://fashionista.com/2022/03/olaplex-infertility-controversy-ingredient-reformulation.

46.    Even then, Olaplex failed to take the problematic lilial-containing Products off the market. Olaplex should have recalled the dangerous Products, requiring that retailers and distributors either (1) return these Products, or (2) destroy them and provide proof of destruction. Instead, we understand Olaplex continues to sell and allows retailers and distributors to continue to sell the runoff inventory it knows contains a dangerous ingredient.

47.    By way of another example, many varieties of the Products contain sodium benzoate and ascorbic and/or citric acid. These chemicals combine to create the molecule benzene. Benzene is a known carcinogenic. In other words, it causes cancer. The ingredient is so dangerous that the beauty industry has stopped using the ingredient and voluntarily recalled hair care products containing benzene. Olaplex has not.

48.    In yet another example of a design defect, the Products contain non-water-soluble substances that consumers are directed or encouraged to leave in the hair for extended periods, users develop clogged, inflamed, impacted and infected hair follicles—in other words, Seborrheic Dermatitis ("SD"), characterized by red, itchy, inflamed, blistered, flaking or scaling skin as well as hair loss.  The American Hair Loss Association explains:

> Although all this inflammation is not specifically directed at the hair follicle, if hair follicles are in the vicinity of the inflammatory cells then they can still be adversely affected. Hair follicles find inflamed skin an unhealthy environment in which to grow. Thus seborrheic

dermatitis may non-specifically cause diffuse hair loss.[4]

49.     Healthy hair follicles release natural oils that make their way from the follicle down the hair shaft. This process helps keep hair strong, moisturized, free from frizz and shiny. Clogged hair follicles disrupt the hair's natural lubrication process, causing the hair to become dry, brittle, frizzy, dull, split and highly vulnerable to breakage.

50.     Clogged hair follicles also lead to yeast and bacterial infections as microbes have been shown to increase with SD and thrive on the conditioning agents found in the Products and other dirt and debris that becomes impacted.[5]

51.     Each variety of the Products contain known skin irritants and sensitizers, which constitute another example of a design defect. These irritants cause ACD. ACD leads to extreme diffuse hair loss according to treating physicians[6] and researchers.[7] As one Yale trained dermatologist explained,

> [I]f the scalp gets inflamed enough from the use of a cosmetic product, hair loss can certainly be a symptom. The condition is called allergic contact dermatitis (ACD), and it causes irritated, often itchy, red rashes in areas of contact with various chemical products. Preservatives, dyes, surfactants, fragrances, and plant extracts are among the common ingredients that cause this problem.[8]

---

[4] *Id.*

[5] *See* American Hair Loss Association, *Seborrheic Dermatitis*.

[6] *See* Dr. Mona Gohara, Your Conditioner Could Actually be Causing Hair Loss, Fitness.

[7] Dr. Antonella Tosti, et al., *Telogen Effluvium After Allergic Contact Dermatitis of the Scalp*, Arch Dermatol., February 2001.

[8] *See* Your Conditioner Could Actually be Causing Hair Loss, *supra*.

52.     This just makes common sense.

53.     In more serious cases, exposure to these sorts of allergens trigger a more systemic auto immune disease, such as alopecia areata, an auto-immune related hair loss. As discussed by the National Association of Alopecia Areata, a non-profit that "educates the public about alopecia areata,"[9] although its cause is still somewhat uncertain, alopecia areata is a condition understood at this time to be triggered by, among other things, external substances, such as allergens.[10] Just as with allergic contact dermatitis, the exposure stimulates the body's immune system, causing it to mistake—and attack— normal cells for foreign invaders.[11]

54.     The Products design is further defective in its overuse of plasticizing agents, such as glycol. Far from repair dry and damaged hair, overuse of these plasticizing ingredients weakens hair and actually causes hair damage.

55.     Defendants' instructions for use of the Products exacerbate these injuries. Defendants direct and/or encourage consumers to leave the Products in their hair for long periods of time or indefinitely. For instance, Defendants tell consumers that No. 3—the best seller and cornerstone of the Products—"reaches its max efficacy at 30-45 minutes however OLAPLEX is actively working in the hair as long as the

---

[9] Nat'l Alopecia Areata Foundation, *About NAAF*, https://www.naaf.org/about.
[10] *See* Nat'l Alopecia Areata Foundation, *What You Need to Know About Alopecia Areata*, https://www.naaf.org/alopecia-areata.
[11] *See id.*

13

hair remains moist."[12] In the Frequently Asked Questions section of the Olaplex website, Defendants go even farther: "we have received great feedback from people who have" slept in an Olaplex treatment.[13] Defendants coyly hedge a bit in this, explaining, "[a]s a company, we do not recommend sleeping in OLAPLEX treatments," but only because "it could get into your eyes."[14] Defendants never warn that the longer a consumer's exposure to problematic ingredients in the Products, the greater the risk of SD, ACD or the damaging effects of plasticizing agents.

**False, Misleading and Unconscionable Business Practices**

56.     Defendants also engage in sharp business practices, which like their false claims about the Products, mislead consumers as to the Products' efficacy and safety.

57.     Defendants claim the Products enjoy wild popularity and celebrity endorsement.  The Olaplex website names celebrities it claims use and endorse the Products and use celebrity photos as part of its marketing. On information and belief, many of these celebrities do not regularly use the Products, do not sponsor or endorse the Products and are, in fact, unaffiliated with the Products or Defendants in any way. Those celebrities who have used the Products have done so once or twice or sporadically, primarily because Defendants offer the Products to them for free or

---

[12] https://olaplex.com/pages/frequently-asked-questions.
[13] https://olaplex.com/pages/frequently-asked-questions.
[14] *Id.*

based on some other incentive.

58.     Defendants reinforce these surreptitious celebrity endorsements with "Transformation" pictures, showing before and after photos on their websites that purport to demonstrate how the average person can attain celebrity hair as their own. However, these "average" people are actually paid models who do not regularly use the Products as recommended by Defendants and, unbeknownst to consumers, Plaintiffs, in particular, the posted pictures show hair that has been styled by a professional.

59.     In that same vein, Defendants pay to have the Products featured in magazines and then brag about the press coverage, never disclosing the coverage amounts to no more than a purchased ad.  Defendants also pay for mentions on blogs and in other social media, using influencers, usually those influencers who identify as members of the curly hair community and dedicate a significant portion of their content to hair repair, maintenance, routines and other tutorials. An influencer accepts payment to promote a particular good or service on social media, such as Instagram, YouTube and/or Twitter, for which they have a large audience. Defendants hires influencers as part of its overall marketing strategy and works closely with these influencers to produce the Products-related content, providing photos of the Products to be featured and other content material, offering promo codes that the influencer will then offer the influencer's audience, etc. In these ways, Defendants control the

content. Defendants compensate influencers by way of commissions on sales of the Products made through "affiliate links" on their social media sites and/or with free Products. Defendants do not disclose to consumers its financial relationship with influencers or their control over the content of its sponsored influencers. Defendants do not require the influencers with whom they work to make such disclosures.

60.     Research shows influencer marketing to be quite compelling. Researchers found that influencer advertisement generates 277% greater emotional intensity and 87% higher memory encoding than television ads.[15] In one study, 93% of women, all of whom consider themselves "social media savvy," had purchased something at an influencer's suggestion.[16] Another report found businesses earned an extraordinary 520% return on every dollar spend toward influencer marketing.[17] It is

---

[15] Alexandra J. Roberts, *False Influencing*, Georgetown Law J., p. 4, vol. 109, No. 1, 2020 ("False Influencing") (citing Blake Droesch, What Does Your Brain on Influencer Marketing Look Like?, eMarketer (Aug. 26, 2019) https://www.emarketer.com/contect/your-brain-on-influencers-neuroscience-study-explains-the-effects-of-influencer-marketing [https://perma.cc/5GXUFY8L].

[16] False Influencing, 4 (citing Stefania Pomponi Butler, Social Media and the Female Holiday Shopper (Infographic), BUSINESS2COMMUNITY (Nov. 15, 2012) https://www.business2community.com/social-media/social-media-and-the-female-holiday-shopper-infographic-0332987 [https://perma.cc/U6QW-JF89].

[17] False Influencing, 4 (citing NeoReach, Influencer Marketing Benchmark Report 2019, (Feb. 12, 2019) https://neoreach.com/influencer-marketing-benchmark-report-2019/ [https://perma.cc/QT44-LEM3] and Dominique Jackson, Social Proof: How to Use Marketing Psychology to Boost Conversions, SPROUT SOCIAL (May 29, 2018) https://sproutsocial.com/insights/social-proof/ [https://perma.cc/2P39-ZQY9] ("Businesses are averaging $6.50 for every $1 spent on influencer marketing.")).

not surprising then that Olaplex has relied heavily and increasingly on influencer marketing.[18] The apparent authenticity of the influencer marketing drives its success.[19] Consumers find influencers to be much more credible than the brand and, consequently, trust influencers more than even their real-world friends.

61.     Because of the unprecedented power of social media influencers, the Federal Trade Commission (the "FTC") has established strict guidelines for disclosing paid influencing. "When there exists a connection between the endorser and the seller of the advertised product that might materially affect the weight or credibility of the endorsement (i.e., the connection is not reasonably expected by the audience), such connection must be fully disclosed." Guides Concerning Use of Endorsements and Testimonials in Advertising, 16 C.F.R. § 255.5 ("FTC Guidelines").

62.     In addition to its social media promotions and influencer marketing, Defendants offer a less than rigorous *free* online training course, after which a hair stylist can become Olaplex "certified" and begin using—and, of course, selling—the Products.[20]   Defendants promote stylists who complete the training through a directory program found on the Olaplex website and by providing marketing

---

[18] *See* https://digiday.com/marketing/engaging-with-our-audience-why-olaplex-is-focusing-on-community-building-via-tiktok-instagram/amp/.

[19] False Influencing, 3.

[20] https://certificate.olaplex.com

materials and strategy, and stylist support services.

63.     Defendants also sell the Products through major retailers, such as Sephora, Ulta, and Amazon, pursuant to written agreements. Defendants provide these retailers with product descriptions and other promotional materials, which the retailers are required to use in their promotion of the Products.

64.     Defendants plan, create and execute websites, social media accounts, magazine advertising, a community of affiliated salons and stylists, influencers and other brand ambassador programs, apparent endorsements, transformation photos and videos, testimonials, retail suppliers and other direct marketing channels as part of an overall international advertising campaign (the "Campaign").

**Efforts to Conceal Dangers**

65.     Defendants' sharp practices have not stopped there. Defendants have also taken affirmative action to conceal the dangers of the Products and, in these efforts, thwarted Plaintiffs and others from discovering they had suffered cognizable injuries caused by Defendant's wrongful conduct. It never occurred to Plaintiffs and other users that the Products—touted by Defendants as safe for all hair, free of a laundry list of harsh chemicals and are scientifically formulated and proven to repair dry and damaged hair —could actually be hurting their hair and scalp, not helping. To the contrary, many believed their situation would have been worse but for the Products. Some worried, along with their families, their hair loss, scalp issues and

other personal injuries could be symptoms of a dire health condition. Many of them went from doctor to doctor desperate for answers, all to no avail.

66.    Defendant has made matters worse by failing to disclose—indeed, actively concealing— the number of complaints of hair loss, scalp issues and other injuries it has received from customers and, on information and belief, the FDA. Defendants have been dismissive of their customers' hair loss, instead describing hair shedding as normal and unavoidable and attributing the hair loss to a long list of other potential causes. Had Defendants been transparent even in just disclosing the number of complaints, some Plaintiffs and other consumers would have identified the Products as the culprit much sooner, some could have avoided injury altogether and all would have had each other for comfort and support.

67.    Defendants claim testing proves the Products cannot be the cause yet Defendants have refused to provide these so-called test protocols and results. This concealment is highly suspect, especially given Defendants' claims the Products are scientifically formulated and proven.

68.    Although Defendants have received thousands of complaints and learned of countless others through social media and major media outlets, it has failed and refused to formally recall any of the Products. Nor have Defendants issued any new warnings or otherwise disclosed the defects and dangers associated with the Products.

69.     Defendants has undertaken what is essentially a voluntary and entirely self-serving partial recall. Olaplex usually accepts returns and issues refunds for Products under certain limited parameters. However, after concerns about the safety and efficacy of the Products became public, Olaplex has allowed customers to return Products, "no questions asked," for a full refund without regard to the date of purchase and the amount of product left in the returned bottle(s). In so doing, Olaplex hopes to appease injured consumers and sweep under the rug the dangers presented by the Products. This single purpose is made all the more clear by what Olaplex has not done: it has not recalled the Products from retailers and other third party distributors; it has not destroyed or required retailers and other third party distributors to destroy the Products; and it has not reported the many complaints it has received concerning the Products to the FDA or any other regulatory body.

**Plaintiffs' Injuries**

70.     Defects in the Products have caused Plaintiffs serious injury. They have lost their hair—in some cases more than half and leaving bald spots in others. The Products have transformed what hair remains as well. Far from repairing and protecting hair from damage, the Products have instead left Plaintiffs' hair dry, brittle, frizzy and dull. The hair has split and broken, causing it to look unkept and as if it were cut with a weedwhacker. The Products have also changed the texture of Plaintiffs' hair. Even those who once had beautiful defined curls or waves now have

frizzy, straight-ish hair. Plaintiffs have suffered scalp injuries, too, including, but not limited to, extreme itchiness, rash, yeast infection, bacterial infection, open sores, burning and overall sensitivity.

71.     Counsel has together with each plaintiff carefully considered all other common cause of hair loss and scalp injuries. In each case, there is no other cause of the injuries; the Products alone are to blame.

72.     The following photographs depict the type of hair loss and scalp injury damage caused by the Products.







22











73.    Numerous studies show that the psychological impact of hair loss is often severe and debilitating, especially for women. Hair represents beauty, health, youth, individuality and sexuality. The loss or destruction of hair is closely tied with self-identity and self-confidence. Many people facing hair loss suffer extreme anxiety and depression, some become house bound and studies report cases where hair loss and damage leads to self-harm, eating disorders and other very dangerous and deadly psychological conditions. Each Plaintiff has suffered emotionally as a result of the injuries to their hair and scalp caused by Defendants. The most common of their emotional injuries include, but are not limited to, sleeplessness, a change in appetite, depression, anxiety, irritability, tearfulness, loss of desire to engage in activities they

25

used to enjoy, fear of leaving the house and an inability to focus while struggling with intrusive and obsessive thoughts about their hair and scalp injuries and how they might address them.

74.     These symptoms do not occur in a vacuum. Injuries to a person's sense of self, confidence and well-being impact every aspect of their lives and the dynamics of every relationship. Plaintiffs have struggled in their relationships with friends, partners, children and at work. In some cases, Plaintiffs have lost income due to an inability to work and from loss of opportunities to advance their careers, which requires relationship building.

## PLAINTIFF-SPECIFIC ALLEGATIONS

75.     Plaintiff Michelle Alabahae purchased the Olaplex products between February – April/May 2022 online through Olaplex.com and Amazon.com based on representations regarding the safety, formulation and efficacy of the Products made by Defendants on Olaplex.com and, more generally online, *see supra*, Background Facts, paras. 40-74, before her first purchase, especially claims that the Products "restore[] damaged and compromised hair." Plaintiff used the Products as directed, including the use of #0, #3, #4, #5, #6 and #7.  Plaintiff suffered hair loss, hair breakage, poor hair condition, a yeast infection, scalp pain and constant dry and irritated/inflamed scalp.

76.     Plaintiff Megan Arcadi purchased the Olaplex products

between September 2022-November 2022 in person from Cosmoprof and Trustar based on representations made by Defendants by certain Olaplex-certified hair stylists *see supra*, Background Facts, paras. 40-74, regarding the safety, formulation and efficacy of the Products, especially claims that the Products would safely and without harmful chemicals: drastically reduce hair breakage, lead to better, healthier hair, protect hair from damage caused by chemical services, builds bonds to replace what was stripped from hair by styling and overall improve hair texture and quality. Plaintiff used the Products as directed, including the use of #4P, #4, #5 and #6.  Plaintiff suffered hair loss, hair breakage, poor hair condition, hair discoloration, and scalp/facial irritation or rash. The Olaplex-certified stylists on which the Plaintiff are Guy Tang, Gabbie Hanna, Larissa Love, Brad Mondo and Hannah Forcier, who appeared on Facebook, YouTube, Instagram and TikTok. On information and belief, these stylists received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

77.     Plaintiff Jessica Auriana purchased the Olaplex products on August 16, 2022 through her stylist based on representations made on August 16, 2022 and after regarding the safety, formulation and efficacy of the Products made by Defendants through her stylist, Claudia Cruz, and advertisements seen on Instagram, *see supra*, Background Facts, paras. 40-74 before purchasing the Products, especially claims

27

that the Products safely, and without using harsh or harmful chemicals, "restore[]
damaged and compromised hair" and are "the best thing for your hair."   Plaintiff
used the Products as directed, including the use of #4, #5 and #4P-Purple Clarifying
Shampoo. Plaintiff suffered hair loss, balding, itchy scalp, hair texture change, dry
hair and depression. Plaintiff's stylist, Claudia Cruise, works at Skye Studio, located
at 45 Eastdale Ave. N, Suite 201, Poughkeepsie, NY 12603. Ms. Skye is authorized
to sell Olaplex at her salon and, on information and belief, received marketing
materials from Olaplex with directions from Olaplex to use the materials and the
claims made therein in marketing the Products to potential customers on behalf of
Olaplex. Ms. Skye stated that everyone raved/swore by Olaplex and that the Products
restore dry, damaged hair and are especially good for color treated hair.

78.    Plaintiff Joanne Brown purchased the Olaplex products between June
2021-September 2022 online through Sensational based on representations regarding
the safety, formulation and efficacy of the Products made by Defendants through her
stylist in June 2021 and, before purchasing the first of the Products, online, including
on Olaplex.com, *see supra*, Background Facts, paras. 40-74. Plaintiff heard/saw and
relied on these representations and was especially moved by claims the Products (1)
"restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny,
touchable hair," (3) are "scientifically proven" and "proven by science," (4) "=
strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage

28

insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #3, #4, #5, #6 and #8. Plaintiff suffered hair loss, hair breakage, scalp/facial irritation or rash, scalp/facial rash and poor hair condition. Plaintiff's stylist worked at Beauty Room, located in Easthampstead Bracknell, UK in June 2021. On information and belief, the stylist and Beauty Room received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

79. Plaintiff Mackenzie Cogle purchased the Olaplex products between April 11, 2022-June 28, 2022 in person through Ulta based on representations regarding the safety, formulation and efficacy of the Products made by Defendants through claims of celebrity endorsement by Drew Barrymore, on naturallycurly.com and through social media influencers, *see supra*, Background Facts, paras. 40-74. Plaintiff saw/heard and relied on these representations before her first purchase of the Products and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone,

29

sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the products as directed, including the use of #3.  Plaintiff suffered hair loss, hair breakage and dry hair. With regard to statements made by influencers, Plaintiff watched curly hair influencers Manes by Mell and Gena Marie on YouTube in June 2022, who both said that using Olaplex would improve curl pattern. On information and belief, these influencers received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex. On information and belief, Olaplex failed to obtain express authority from Drew Barrymore to claim Ms. Barrymore endorses the Products and/or failed to regularly confirm with Ms. Barrymore that her endorsement remained unchanged.

80.     Plaintiff Robin Daniels purchased the Olaplex products between May-August 2022 online through Amazon.com based on representations regarding the safety, formulation and efficacy of the Products made by Defendants online, including through Olaplex.com, Facebook, TikTok and Instagram, *see supra*, Background Facts, paras. 40-74. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the

"ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #0, #3, #4, #5, #6, #7, #8 and #9.  Plaintiff suffered hair loss, hair breakage, poor hair condition, scalp/facial irritation or rash, dandruff and itchy scalp.

81.   Plaintiff Roxanna De la Cruz purchased the Olaplex products between September -December 2022 online through Sephora based on representations regarding the safety, formulation and efficacy of the products made by Defendants on Sephora.com, *see supra*, Background Facts, paras. 40-74. Plaintiff saw/heard and relied on these representations before her first purchase and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #3, #4, #4P, #5, and #7.  Plaintiff suffered hair loss, hair breakage and poor hair condition.

82.   Plaintiff Brianda Earle purchased the Olaplex products between July 2022-September 2022 online and in person through Cosmoprof based on

31

representations made by Defendants on Olaplex website *see supra*, Background Facts, paras. 40-74, regarding the safety, formulation and efficacy of the Products before she first purchased the Products, and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #4P, #4, #5 and #6. Plaintiff suffered hair loss, hair breakage, poor hair condition, hair discoloration, scalp/facial irritation or rash, scalp/facial rash and mental distress.

83. Plaintiff Lauren Hudson purchased the Olaplex products between February 2022-November 2022 online through Ulta based on representations regarding the safety, formulation and efficacy of the Products made by Defendants through social media influencer Abbey Young on YouTube, *see supra*, Background Facts, paras. 40-74. Plaintiff saw/heard and relied on these statements before her first purchase of the Products, and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and

"proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #3, #4 and #5. Plaintiff suffered hair loss, scalp/facial irritation or rash, poor hair condition, hair breakage and hair discoloration. On information and belief, influencers Young received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

84.    Plaintiff Tiffany Huval purchased the Olaplex products between March-October 2022 online through Amazon.com based on representations regarding the safety, formulation and efficacy of the Products made by Defendants on Olaplex.com and TikTok, *see supra*, Background Facts, paras. 40-74. Plaintiff saw/heard and relied on these statements before her first purchase of the Products, and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the

Products as directed, including the use of #0, #3, #4, #5, #6 and #8.  Plaintiff suffered hair loss, hair breakage and poor hair condition.

85.     Plaintiff Kat Johnston purchased the Olaplex products between July 2022-September 2022 online through Nordstrom based on representations regarding the safety, formulation and efficacy of the Products made by Defendants through her stylist Leah Johnston *see supra*, Background Facts, paras. 40-74. Plaintiff saw/heard and relied on these statements before her first purchase of the products, and was especially moved by claims the Products (1)  create "healthy, beautiful, shiny, touchable hair," (2) are "scientifically proven" and "proven by science," (3) "= strong, healthy-looking, more resilient hair," (4) provide the "ultimate breakage insurance," and (5) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #4 and #5 after the stylist had used the bonder in the salon.  Plaintiff suffered hair loss, hair breakage, poor hair condition, hair discoloration, burning and itchy scalp, scalp/facial irritation or rash and scalp/facial rash. In addition, Plaintiff has suffered from major depression. Plaintiff's stylist Leah Johnston owns the Hair Hale, 2580 Kekaa Drive #123, Lahaina, Hawaii 96761, where they live and breathe Olaplex. Leah not only said all the phrases mentioned above, but she also stated that Olaplex would make her hair even more beautiful than it already was and stronger, too. Leah refused to

see clients unless they used Olaplex. On information and belief, Plaintiff's stylist received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

86. Plaintiff Eunice Kahler purchased the Olaplex products between July 2022-September 2022 in person through Ulta based on representations made by Defendants on Olaplex displays in Ulta, on the Sephora app and pop-up ads on Facebook and Instagram, *see supra*, Background Facts, paras. 40-74, regarding the safety, formulation and efficacy of the Products, especially claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #4P, #4, #5 and #6. Plaintiff suffered hair loss, hair breakage, poor hair condition, hair discoloration, scalp/facial irritation or rash, scalp/facial rash, hair texture and mental distress.

87. Plaintiff Anna Kurilova purchased the Olaplex products in December 2021 online through Amazon.com based on representations regarding the safety,

formulation and efficacy of the Products made by Defendants on Olaplex.com, *see supra*, Background Facts, paras. 40-74. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the products (1) create "healthy, beautiful, shiny, touchable hair," and (2) are "scientifically proven" and "proven by science," Plaintiff used the Products, specifically #3, as directed.  Plaintiff suffered hair loss, hair breakage and poor hair condition.

88.     Plaintiff Leslie McDonald purchased the Olaplex products between July- September 2022 online through Ulta Beauty based on representations regarding the safety, formulation and efficacy of the Products made by Defendants on Olaplex.com, Ulta.com and Sephora.com, *see supra*, Background Facts, paras. 40-74. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products (1) create "healthy, beautiful, shiny, touchable hair," (2) "= strong, healthy-looking, more resilient hair," and (3) provide the "ultimate breakage insurance," Plaintiff used the Products as directed, including the use of #3, #4, #4c, #5, #6 and #7.  Plaintiff suffered hair loss, hair breakage, poor hair condition, scalp/facial irritation or rash and scalp/facial rash.

89.     Plaintiff Leslie Orr purchased the Olaplex products between July 2021-February 2022 in person through Just Your Style Salon based on representations

regarding the safety, formulation and efficacy of the Products made by Defendants through her stylist and on social media, *see supra*, Background Facts, paras. 40-74. Plaintiff saw/heard and relied on these statements before her first purchase of the Products, and was especially moved by claims the Products (1) create "healthy, beautiful, shiny, touchable hair," and (2) are "scientifically proven" and "proven by science." Plaintiff used the Products as directed, including the use of #4, #5 and #7.  Plaintiff suffered hair loss, hair breakage, poor hair condition, hair discoloration, itchy irritated scalp, scalp/facial rash, burning scalp and scalp/facial irritation or rash. In addition to the injuries from using the product, Plaintiff has suffered a lack of self-esteem and depression. Plaintiff's stylist is Tibi Brimhall of Just Your Style Salon, located at 658 N. 800 E, Spanish Fork, UT 84660. On information and belief, Plaintiff's stylist and Just Your Style Salon received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

90.     Plaintiff Sylva Pate purchased the Olaplex products in September 2022 in person through Sephora and Ulta based on representations regarding the safety, formulation and efficacy of the Products made by Defendants on the Sephora, Olaplex, and Ulta website and on social media (although she cannot recall the specific influencers), *see supra*, Background Facts, paras. 40-74. Plaintiff saw/heard these statements before her first purchase of the products, and was especially moved by

claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) "= strong, healthy-looking, more resilient hair," and (4) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #4, #4C, #5 and #8.  Plaintiff suffered hair loss, scalp/facial irritation or rash, poor hair condition hair breakage, hair discoloration and extreme scalp burning and pain. On information and belief, the influencers on which Plaintiff relied received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex..

91.    Plaintiff Nicole Quenga purchased the Olaplex products between May-August 2022 in person through Ulta based on representations regarding the safety, formulation and efficacy of the Products made by Defendants on the Olaplex.com website, *see supra*, Background Facts, paras. 40-74. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #3, #4 and #5.  Plaintiff suffered hair loss, hair breakage, poor hair condition, irritated/sore/burning scalp and scalp/facial irritation or rash.

92.     Plaintiff    Melinda    Quinn    purchased    the    Olaplex    products between January 2022- March 2022 in person at a hair salon in Bonaire in the Caribbean and online through Amazon.com based on representations regarding the safety, formulation and efficacy of the Products made by Defendants through her stylist, *see supra*, Background Facts, paras. 40-74. Plaintiff saw/heard and relied on these statements before her first purchase of the products and was especially moved by claims the Products "= strong, healthy-looking, more resilient hair" and would make her curly hair less frizzy and more manageable. Plaintiff used the Products as directed, including the use of #0, #3 and #6. Plaintiff suffered hair loss, hair breakage, poor hair condition, scalp irritation, itchy scalp and burning scalp. Plaintiff's stylist was Barbel of Be Youty Salon, located at Kaya Papa Cornes 37, Kralendijk, Bonaire. On information and belief, Plaintiff's stylist received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

93.     Plaintiff Natalie Register purchased the Olaplex products in June 2022 in person through Sephora based on representations regarding the safety, formulation and efficacy of the Products made by Defendants on the Sephora website and packaging of the Products, *see supra*, Background Facts, paras. 40-74. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and

was especially moved by claims the Products do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" and "repairs and strengthens all hair types." Plaintiff used the Products as directed, including the use of #3.  Plaintiff suffered extreme hair loss, loss of eyebrows and eyelashes, overall balding, hair breakage, painful sore like bumps on the scalp, hair texture, chronic headaches, severe scalp itching, severe scalp pain, loss of pigmentation, depression and loss of menstrual cycle for 3 months.

94.    Plaintiff Sarah Richardson purchased the Olaplex products in February 2022 in person through Ulta Beauty based on representations regarding the safety, formulation and efficacy of the Products made by Defendants on its Tik Tok account, through influencers on Instagram and Tik Tok (although she cannot recall names) and the Ulta website, *see supra*, Background Facts, paras. 40-74. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products "restore[] damaged and compromised hair," and provide the "ultimate breakage insurance." Plaintiff used the Products as directed, including the use of #4, #5 and #6.  Plaintiff suffered hair loss, hair breakage and poor hair condition. On information and belief, the influencers Plaintiff saw and relied on received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to

potential customers on behalf of Olaplex.

95.     Plaintiff Amy Shay purchased the Olaplex products between March 2021-September 2022 in person through Sephora and Ulta based on representations regarding the safety, formulation and efficacy of the Products made by Defendants on Olaplex.com, *see supra*, Background Facts, paras. 40-74. Plaintiff saw/heard and relied on these statements before her first purchase of the Products before her first purchase of the Products, and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2)  create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #0, #3, #4, #4P, #5, #6, #7, #8 and #9.  Plaintiff suffered poor hair condition hair breakage and hair texture.

96.     Plaintiff  Debra  Sterlacci  purchased  the  Olaplex  products between September 2021-Summer 2022 in person through Cosmoprof based on representations regarding the safety, formulation and efficacy of the Products made by Defendants on Olaplex.com, *see supra*, Background Facts, paras. 40-74. Plaintiff saw/heard and relied on these statements before her first purchase of the Products,

and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) "= strong, healthy-looking, more resilient hair," and (3) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #0, #3, #4, #5, #6, #7, #8 and the 4 in 1 moisture mask.  Plaintiff suffered hair loss, hair breakage and poor hair condition.

97.    Plaintiff Miecha Isys Thomas purchased the Olaplex products between March and May 2021 in person through Sephora based on representations regarding the safety, formulation and efficacy of the Products made by Defendants on Olaplex.com and Sephora in-store advertisements, *see supra*, Background Facts, paras. 40-74. Plaintiff saw/heard and relied on these statements before her first purchase of the Products, especially claims the Products do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of shampoo #4, conditioner #5, #0 and #3.  Plaintiff suffered hair loss, hair breakage, poor hair condition, scalp/facial irritation or rash, scalp/facial rash, burns to scalp, and changes in her hair texture and curl pattern.

98.    Plaintiff Leslie Tolstoy purchased the Olaplex products in October 2022 in person through Phagans School of Hair Design, 12000 SE 82nd Ave #4010, Happy

Valley, OR 97086, based on representations regarding the safety, formulation and efficacy of the Products made by Defendants through an Olaplex-affiliated hair stylist, Alana Ice and members of the Phagans School salon, *see supra*, Background Facts, paras. 40-74. Plaintiff saw/heard and relied on these statements before her first purchase of the products, and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," and (5) provide the "ultimate breakage insurance." Plaintiff used the Products as directed, including the use of #0, #3, #4 and #5. Plaintiff suffered hair loss, hair breakage, dry brittle hair, balding patches, scalp irritation and trouble thinking/concentrating. On information and belief, Ice and Phagans School received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

99.     Plaintiff Alexandra Urresti purchased the Olaplex products between March 2022-November 2022 online through Cosmoprof based on representations regarding the safety, formulation and efficacy of the Products made by Defendants through retailers Sephora and Ulta *see supra*, Background Facts, paras. 40-74, especially claims the Products (1) create "healthy, beautiful, shiny, touchable hair," (2) "= strong, healthy-looking, more resilient hair," and (3) do not

contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!"  Plaintiff used the Products as directed, including the use of #4, #5, #6 and #7.  Plaintiff suffered hair loss, scalp/facial irritation or rash, poor hair condition hair breakage and scalp/facial rash. On information and belief, Sephora and Ulta received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

100.   Plaintiff Rebekah Valentine purchased the Olaplex products in July 2022 online through Sephora based on representations regarding the safety, formulation and efficacy of the Products made by Defendants through her stylist at Salon Nuuvo, *see supra*, Background Facts, paras. 40-74. Plaintiff saw/heard and relied on these statements prior to her first purchase of the Products and was especially moved by claims the Products provide the "ultimate breakage insurance," will prevent breakage if added to bleach, and "do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #0, #3, #4, #5 and #6.  Plaintiff suffered hair loss, poor hair condition, hair breakage, change in hair texture and hair discoloration. Plaintiff's stylist is Raychel Harrison, who owns Salon Nuuvo, located at 26777 Agoura Rd. b3,

Calabasas, CA 91302. On information and belief, Plaintiff's stylist received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

101.    Plaintiff Robin Yeager purchased the Olaplex products in October 2020 and then again April 2022 online through Cosmoprof based on representations regarding the safety, formulation and efficacy of the Products made by Defendants by Plaintiff's stylist, Faye Stasiak at Shear Desire, *see supra*, Background Facts, paras. 40-74. Plaintiff saw/heard and relied on these statements before her first purchased of the Products and was especially moved y claims the Products (1) create healthy, beautiful, shiny, touchable hair, (2) protect the integrity of blonde hair that is chemically treated, and (3) "= strong, healthy-looking, more resilient hair." Plaintiff used the Products as directed, including the use of #3, #4 and #5.  Plaintiff suffered hair loss, hair breakage and poor hair condition. Shear Desire is located at 6170 Pearl Rd., Parma Heights, OH 44130. On information and belief, Plaintiff's stylist received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

102.    Plaintiff Maureen Zavatone purchased the Olaplex products between Spring 2022-December 2022 in person from her stylist and CVS based on

representations regarding the safety, formulation and efficacy of the Products made by Defendants on the product packaging and in general advertising, *see supra*, Background Facts, paras. 40-74. Plaintiff relied on these statements prior to her first purchase of the Products and was especially moved by claims the Products create "healthy, beautiful, shiny, touchable hair." Plaintiff used the Products as directed, including the use of #0, #7 and #8 Moisture Mask. Plaintiff suffered hair loss, hair breakage and poor hair condition.

## AGENCY AND PRIVITY OF THIRD PARTIES

231.   To the extent third parties made the false and misleading statements to Plaintiffs on which they relied (see *infra*, Plaintiff-Specific Allegations), the third parties were agents of Olaplex and made the representations on Olaplex's behalf with the consent of Olaplex and the third party using information and promotional materials provided by Olaplex to the third party for the purpose of promoting the Products and otherwise subject to Olaplex's control. Olaplex expressly directed these third-party agents to make the false and misleading statements or, by virtue of Olaplex's promotion of these third parties on its website and in other advertisements and its training of these agents, the agents and Plaintiffs reasonably believed the agents were authorized to make these statements in their promotion of the Products to Plaintiffs. Furthermore, the agents made the false and misleading statements and/or sold the Products to Plaintiffs pursuant to an agreement with Olaplex to promote

and/or sell the Products. Therefore, Plaintiffs are in contractual privity with Olaplex even if they relied on statements made by or purchased Products from Olaplex's agents.

## FIRST CAUSE OF ACTION

### Breach of Express Warranty

### Against Olaplex

232.   Plaintiffs hereby incorporate and restates the above allegations by reference as though fully set forth herein.

233.   Plaintiffs formed a contract with Olaplex at the time they purchased the Products. The terms of that contract include the promises and affirmations of fact made by Olaplex through marketing and advertising as part of the Campaign. This marketing and advertising constitute express warranties and became part of the basis of the bargain, and are part of the standardized contract between Plaintiffs and Defendant.

234.   By way of its Campaign, Olaplex promoted the Products to Plaintiffs using multiple false and/or misleading express promises, including, but not limited to claims the Products: (1) "restore[] damaged and compromised hair," (2)  create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals,

47

such as "silicone, sulfates, phthalates, DEA, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!"[21]

235.   For the reasons previously detailed at length, each statement is false and/or misleading. The Products are not safe, do not gentle, free of harsh chemicals, a better alternative to traditional shampoos and extensively tested. To the contrary, the Products contain or contained at all relevant times, among other harsh ingredients, sulfates, silicones, benzene or ingredients which combine to become benzene, lilial and other known allergens, sensitizers and skin irritants. These ingredients are known to cause ACD and trigger other immune reactions due to their status as allergens or sensitizers, to which a large and growing proportion of the population are allergic. As the same time, the Products—what Olaplex sells as a system to repair dry and damaged hair—contain inadequate cleansing ingredients to remove the non-water-soluble components found in the Products as well as dirt, dust, dead skin and other debris commonly found on the scalp and hair. This leads to the buildup and disruption of the hair's natural lubrication system. Build up and lack of natural moisturizers lead to dryness, breakage and brittleness and SD. The symptoms of these conditions are hair loss and other personal injuries, such as itching, blisters and sores, redness, rashes, yeast and bacterial infections of the scalp, among other things. Over time,

---

[21]   https://olaplex.com/pages/how-it-works; https://youtu.be/fEboj5Rdczg?t=107; and https://olaplex.com/pages/frequently-asked-questions.

these conditions cause permanent damage to the scalp and hair follicles and hair. In addition, the Products contain ingredients which

236.   Despite its representations to the contrary, Olaplex did not test these Products extensively or adequately prior to selling them. On information and belief, any HRIPT failed to meet scientific standards in terms of the concentration of the Products used on test subjects. On information and belief, any toxicology testing was limited to review of literature and failed to properly address or evaluate gaps in data for certain ingredients or how certain components of the Products would react when put together in a formula.

237.   All conditions precedent to Olaplex's liability under this contract were performed by Plaintiffs when they purchased and used the Products.

238.   Olaplex breached express warranties about the Products and their qualities because their statements about the Products were false and the Products do not conform to their affirmations and promises. Plaintiffs relied on Defendants' false and misleading claims about the Products including, but not limited to, the claims made by Defendants on social media sites, in purchasing the Products. Plaintiffs would not have purchased the Products had they known the true nature of the Products and the misstatements regarding what the Products are, what they contain and how they would work.

239.   In December 2022, Plaintiffs informed Olaplex in writing of these

breaches and provided Defendant an opportunity to address them.  Olaplex has failed to do so.

240.   As a proximate result of Olaplex's breach of warranty, Plaintiffs have been personally injured and suffered other damages.

## SECOND CAUSE OF ACTION

### Breach of Implied Warranty

### All Plaintiffs Against Olaplex and Cosway

241.   Plaintiffs hereby incorporate and restate the above allegations by reference as though fully set forth herein.

242.   At all times relevant hereto, there was a duty imposed by law on Defendants which requires that a manufacturer or seller's product be reasonably fit for the purposes for which such products are used, and that product be acceptable in trade for the product description.

243.   Notwithstanding Defendants' aforementioned duty, at the time of delivery, the Products sold to Plaintiffs were not merchantable because they contain harmful ingredients and other defect(s) that cause hair loss and other injuries upon proper application and do not contain sufficient cleanser or otherwise perform as represented.

244.   In December 2022, Plaintiffs notified Defendants that the Products were not merchantable.  This notice was within a reasonable time after the defect

manifested to Plaintiffs and other consumers or within a reasonable time after Plaintiffs discovered facts sufficient to determine or suspect the Products, which Defendants tout as safe, made of only gentle, non-harmful ingredients and scientifically formulated and proven, were the cause of their injuries.

245.   As a proximate result of the non-merchantability of the Products, Plaintiffs and other consumers sustained personal injury and other damages.

### THIRD CAUSE OF ACTION

**Violation of California False Advertising Law ("CFAL")**
**Bus. & Prof. Code § 17500 et seq and**
**California Unfair Competition Statute ("CUCS"))**
**Cal. Bus. & Prof. Code § 17200 et seq.**

### All Plaintiffs Against Olaplex and Cosway

246.   Plaintiffs hereby incorporate and restate the above allegations by reference as though fully set forth herein.

247.   Plaintiffs, as purchasers of the Products, are consumers within the meaning of CFAL and CUCS given that Defendants' business activities involve trade or commerce, are addressed to the market generally and otherwise implicate consumer protection concerns.

248.   Defendants engaged in unconscionable commercial practices, deception and fraud in the Campaign, and specifically when marketing the Products to Plaintiffs by, among other things, failure to disclose that it paid or otherwise incentivized influencers, brand ambassadors, hair models, celebrities, magazines and other

advertising media, stylists, salon owners and retailers to promote the Products using content controlled by Defendant in violation of FTC regulation and guidance. In so doing, Defendant affirmatively misrepresented these third parties endorsed the Products without the influence of financial or other gain and, with regard to all but retailers, regularly used the Products as recommended by Defendants, that is to say, to the exclusion of other competitive products or, at the least, traditional shampoos. In addition, with regard to influencers, brand ambassadors and celebrities, Defendant affirmatively mispresented that these parties could achieve their hair styles without the use of professional hair stylists. Finally, Defendant also suggested celebrities regularly used the Products and/or endorsed or sponsored or were affiliated with the Products or Defendant when, in fact, none of those things were true.

249. Defendant intentionally obscured the commercial nature of the representations made by these agents with the intent that consumers, including Plaintiffs, would perceive that advertising as excited peer-to-peer testimonials arising strictly from customer satisfaction, not paid promotions. Defendant understood that this deception would and did have the effect of making the representations much more effective in selling the Products.

250. The FTC is charged with protecting consumers from false and deceptive advertising. CUCL is modelled on the Federal Trade Commission Act ("FTCA") and courts look to judicial interpretation of the FTCA in interpreting CUCS. *See Lavie v.*

*Procter & Gamble Co.*, 105 Cal. App. 4th 496, 506, 129 Cal. Rptr. 2d 486, 493 (2003) ("Because of this relationship between the [UCL] and the Federal Trade Commission Act, judicial interpretations of the federal act have persuasive force."). Violation of CFAL constitutes an unlawful act for purposes of CUCS. *Roper v. Big Heart Pet Brands, Inc.*, 510 F. Supp. 3d 903, 922 (E.D. Cal. 2020).

251.   The FTCA requires prominent, clear and conspicuous disclosure "[w]hen there exists a connection between the endorser and the seller of the advertised product that might materially affect the weight or credibility of the endorsement." *Id.* (citing 16 C.F.R. § 255.5). Defendants' failure to comply with the FTCA rendered its use of influencer, brand ambassador and similar endorsement-based advertisement misleading and a violation of both CFAL and CUCS.

252.   Beyond its duty to communicate honestly with consumers about the quality and nature of the Products, once Defendants learned of defects in the Products, including their tendency to cause hair loss and other injuries despite proper use (or based upon foreseeable misuse), Defendants owed consumers, including Plaintiffs, a duty to disclose the risks of hair loss and other injuries because those risks would be a material fact in a consumer's decision-making process, and without Defendants' disclosure, consumers would not know that such a risk exists, particularly given Defendants' representations that the Products are safe, free from

harsh or harmful chemicals, repair dry and damaged hair and are scientifically formulated and proven.

253.   Defendant intended that Plaintiffs and other reasonable consumers would rely on—and Plaintiffs, in fact, reasonably and justifiably relied on—Defendants' misrepresentations as to the nature, safety and efficacy including, but not limited to, the claims made by Defendants on social media sites, in purchasing the Products.

254.   Defendants' conduct constitutes false advertising within the meaning of CFAL. Defendants' material non-disclosure constitutes deception, fraud, false promise, misrepresentation and/or omission of material facts as to the nature of the goods in violation of CFAL.

255.   Defendants' conduct also constitutes an unconscionable commercial practice, deception, fraud, false promise, misrepresentation and/or omission of material facts as to the nature of the Products in violation of the CUCS.

256.   Defendants are the producing and proximate cause of Plaintiffs' injuries.

**FOURTH CAUSE OF ACTION**

**Negligence and/or Gross Negligence**

**All Plaintiffs Against Olaplex and Cosway**

257.   Plaintiffs hereby incorporate and restate the above allegations by

reference as though fully set forth herein.

258.   Defendants owed Plaintiffs a duty to use due care in the development, testing, planning, design, marketing and sale of the Products offered for use by consumers.

259.   Through its failures to exercise due care, Defendants breached this duty by producing, processing, manufacturing, distributing and/or offering for sale the Products in a defective condition that was unsafe for use at home by consumers.

260.   Defendants breached this duty of care to Plaintiffs by intentionally failing to follow industry standards that prohibit the use of chemicals that are allergens, sensitizers and/or irritants, are carcinogenic, or for which there is inadequate data to determine their safety for use in products used for long or indefinite periods of time on the skin. In addition, Defendants breached this duty of care to Plaintiffs by intentionally failing to perform research or testing consistent with applicable industry and scientific standards before placing the Products on the market. Further, Defendants breached this duty of care to Plaintiffs by intentionally employing false, misleading and unconscionable advertising and advertising practices.

261.   Defendants further intentionally breached this duty of due care by failing to properly and adequately inform consumers once safety concerns, including hair loss and other injuries, were brought to the Defendants' attention, and further

breached this duty of care by failing to fully and appropriately discontinue the sale of and recall the Products.

262.   Defendants knew, or in the exercise of reasonable care should have known, that the Products present an unacceptable risk to consumers, and would result in damages that were foreseeable and reasonably avoidable.

263.   In each instance where Defendants' conduct fell below the applicable standard of care, Defendants' conduct was intentional and undertaken with knowledge that Defendants' acts or omissions were reckless and likely to lead to serious and long lasting injury to consumers.

264.   As a direct and proximate result of Defendants' above-referenced negligence and gross negligence, Plaintiffs have suffered and are entitled to recover damages, both compensatory and punitive.

**FIFTH CAUSE OF ACTION**

**Product Liability and Strict Product Liability**

**All Plaintiffs Against Olaplex and Cosway**

265.   Plaintiffs hereby incorporate and restate the above allegations by reference as though fully set forth herein.

266.   Defendant Olaplex designs, manufacturers, markets, distributes and/or sells the Products. Defendant Cosway designs and assists in the marketing of the Products.

267.   As discussed above in detail (i.e., use of ingredients that are harsh and harmful, sensitizers, allergens and irritants, carcinogenic and/or that lead clogging of the hair follicle and related symptoms, conditions and infections), the Products are defective in design or formulation rendering the Products unreasonably dangerous with the foreseeable risks of harm far exceeding the benefits associated with the design or formulation. Defendants could have but chose not to design, manufacture and sell a safer alternative to the Products, which was feasible. On information and belief, Defendants made this choice in order to maximize profits—all to the determinant of Plaintiffs and other reasonable consumers.

268.   The Products are defective due to inadequate and unsafe warnings/instructions for use of the Products, particularly Defendants failure to warn—and, in fact, their concealment—of its use of inferior, unsafe and ineffective ingredients, such use being at odds with Defendants' marketing of the Products. In addition, the Products are defective due to inadequate and unsafe warnings/instructions in that Defendants encouraged Plaintiffs and other reasonable consumers to use them to the exclusion of other brands of hair care products and to leave the Products on their skin in hair for long periods of time or indefinitely between washes. Similarly, Defendant's post-market warnings/instructions are inadequate and unsafe because, after Defendant knew or should have known of the risk of injury from the Products, Defendant failed to immediately provide adequate

warnings/instructions to Plaintiffs and the public.

269.   The Products are also defective due to inadequate testing and study and/or the failure to act on or report the results of such tests and studies.

270.   As the direct and proximate result of the defective condition of the Products as produced, manufactured, designed, marketed, distributed and/or sold by Defendants, and of the negligence, carelessness, other wrongdoing and actions of Defendant described herein, Plaintiffs suffered damages.

## SIXTH CAUSE OF ACTION

### Unjust Enrichment

### All Plaintiffs Against Olaplex and Cosway

271.   Plaintiffs hereby incorporate and restate the above allegations by reference as though fully set forth herein.

272.   Defendant has been unjustly enriched in retaining the revenues derived from Plaintiffs' purchases of the Products, because the Defendant obtained  the benefits  conferred  by  Plaintiffs without providing the Products having the characteristics and benefits promised.

273.   Retention of those moneys under these circumstances is unjust and Defendant falsely and misleadingly represented that the Products, Plaintiffs paid a price premium for the Products based on the false and misleading representations, and the Products did not have the characteristics and benefits promised and instead

are rendered dangerous due to defects that cause hair loss, scalp issues and other injuries. Plaintiffs have suffered injuries as a result.

274.   Plaintiffs would not have purchased (or paid a price premium) for the Products had they known of the defects that cause injuries.

275.   Defendants' retention of the non-gratuitous benefits conferred on it by Plaintiffs is unjust and inequitable, and because equity and good conscience requires restitution, Defendants must pay restitution to Plaintiffs for its unjust enrichment, as ordered by the Court.

## ATTORNEYS' FEES, EXPENSES AND COSTS

276.   Plaintiffs hereby incorporate and restate the above allegations by reference as though fully set forth herein.

277.   Plaintiffs have been forced to secure the assistance of counsel to protect their legal rights and mitigate their damages as a result of the Defendants' wrongful conduct.

278.   Having made proper presentment and provided actual and sufficient notice of their claims to Defendants, Plaintiffs seek recovery of their reasonable attorneys' fees, expenses and costs pursuant to all applicable statutes, regulations and agreements.

## PRAYER

WHEREFORE Plaintiffs pray for Judgment against Defendant as follows:

For an award of actual and consequential damages according to proof;

For an award of punitive damages according to proof;

For restitution in the form of disgorgement of Defendants' ill-gotten profits;

For an award of reasonable attorneys' fees, costs and expenses incurred herein;

For an award of pre- and post-judgment interest; and;

For all other relief to which they may be justly entitled.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand trial by jury under Fed. R. Civ. P. 38.

Dated: February 9, 2023

Respectfully submitted,

LAW CENTER OF AMY E. DAVIS, LLC

By:      /s/ *Amy E Davis*
         Amy E. Davis (*pro hac vice pending*)
         1021 N. Bishop Ave.
         Dallas, TX 75208
         adavis@cdfirm.com

GORDON & PARTNERS, P.A.

         Steve Calamusa (*pro hac vice pending*)
         Geoff S. Stahl (*pro hac vice pending*)
         Rachel Bentley (*pro hac vice pending*)
         4114 Northlake Blvd.
         Palm Beach Gardens, FL 33410
         Telephone: 561-799-5070
         SCalamusa@fortheinjured.com
         GStahl@fortheinjured.com

RBentely@fortheinjured.com

MURPHY ROSEN LLP

David E. Rosen (SBN 155385)
Email: drosen@murphyrosen.com
100 Wilshire Boulevard, Suite 1300
Santa Monica, California  90401-1142
Telephone:  (310) 899-3300
Facsimile:  (310) 399-7201

*Attorneys for Plaintiffs*