Amy E. Davis (*admitted pro hac vice*)
LAW CENTER OF AMY E. DAVIS, LLC
1021 N. Bishop Ave.
Dallas, TX 75208
Telephone: (214) 838-3501
adavis@cdfirm.com

Steve Calamusa (*admitted pro hac vice*)
Geoff S. Stahl (*admitted pro hac vice*)
Rachel Bentley (*admitted pro hac vice*)
Gordon & Partners, P.A.
4114 Northlake Blvd.
Palm Beach Gardens, FL 33410
Telephone: 561-799-5070
SCalamusa@fortheinjured.com
GStahl@fortheinjured.com
RBentley@fortheinjured.com

DAVID E. ROSEN (SBN 155385)
Email: drosen@murphyrosen.com
MURPHY ROSEN LLP
100 Wilshire Boulevard, Suite 1300
Santa Monica, California 90401-1142
Telephone:  (310) 899-3300
Facsimile: (310) 399-7201

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MICHELLE ALBAHAE, CHELSEA ARANJO, MEGAN ARCADI, JESSICA AURIANA, JULIETTE BALL, CHELSEA BALMER, REBECCA BARNHOUSE, TIFFANY BERRY, DONNA BOWEN, ASHLEY BRANNING, EMMA BRODERICK JOANNE BROWN, HEATHER BURKETT-MURPHY, HOLLY BURKHART, HILARY CECILE, MACKENZIE COGLE, ASHLEY COURTNEY, ANGELINA DA GAMA, SARAH DAHAN, HOPE DALEY-DERRY, ROBIN DANIELS, ROXANNA** | **CASE NO. 2:23-cv-00982-RGK-PLA**<br><br>**FIRST AMENDED COMPLAINT:**<br><br>1. **BREACH OF EXPRESS WARRANTY**<br>2. **BREACH OF IMPLIED WARRANTY**<br>3. **VIOLATION OF CALIFORNIA CONSUMER PROTECTION AND FALSE ADVERTISING LAWS**<br>4. **NEGLIGENCE/GROSS NEGLIGENCE – DANGEROUS DESIGN, FAILURE TO WARN/INSTRUCT AND FAILURE TO TEST** |

**DE LA CRUZ, KATHERINE DONNELLY, BRIANDA EARLE, MONICA EASILY, JACOB EISEN, MICHELLE ESTRADA, SANDRA FERGUSON, AMANDA FONTENOT, DENISHA FREEMAN, HEATHER GARON, JENNIFER GEORGESON, ALANA GREEN, NICOLE HOFF, MONICA HOLLIFIELD INDIVUALLY AND ON BEHALF OF S. H., LAUREN HUDSON, TIFFANY HUVAL, ALEHA INGLE, HEATHER JACKSON, KHILA JAMES,  KAT JOHNSTON, JESSICA JONES INDIVUALLY AND ON BEHALF OF P. J., EUNICE KAHLER, TANYA KARAKASHEVA, KATHLEEN KEEHNER, LIZA KRENGEL, ANNA KURILOVA, JULIA LEON, KRISTIE LETIZIA, TINA LEWIS, LAURA LLEWELLYN, STACEY LOBDELL, LLASMIN LOZOYA, LYANA LUCIANO, KIM MARIETTA, THERESA MCCORMACK LESLIE MCDONALD, LISA MENDEZ, JILL MOOSHAGIAN, JENNIFER MORGAN, AMANDA MURPHY, JESSICA NGUYEN LESLIE ORR, HEATHER PASSMORE, SYLVA PATE, SARA PETTY, DANIELLE PHELPS, ERICA PILICY-RYAN, ROBIN POSTON, NICOLE QUENGA, MELINDA QUINN, CHARITY REDDISH, NATALIE REGISTER, JEAN RICCIO SARAH RICHARDSON, HEATHER RIFE, ALEXA ROEMER, FELICIA SANCHEZ, AMY SHAY, FARZANA SIDDIQUEI, DANIELLE SIGMON, RHIANNON SINGER, JODI SOBIECH,**

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**5.  PRODUCT LIABILITY/STRICT PRODUCT LIABILITY – DESIGN, WARNING/INSTRUCTION AND TEST DEFECTS**

**DEMAND FOR JURY TRIAL**

**MARIA SOKOLOVA DEBRA
STERLACCI, MIECHA ISYS
THOMAS, VANESSA TOCCO, NOEL
TALERICO, MARINA TOLIC, LESLIE
TOLSTOY, ALEXANDRA URRESTI,
REBEKAH VALENTINE, TANYA
VALLEJO, JERRIKA VEGA,
CHRISTINA VENTOR, ROBIN VOGT,
TERRI WITTS, ROBIN YEAGER and
MAUREEN ZAVATONE**

        **Plaintiffs,**

  **v.**

**OLAPLEX HOLDINGS, INC. AND
COSWAY CO., INC.,**

      **Defendants.**

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Plaintiffs Michelle Albahae, Chelsea Aranjo, Megan Arcadi, Jessica Auriana,

Juliette Ball, Chelsea Balmer, Rebecca Barnhouse, Tiffany Berry, Donna Bowen,

Ashley Branning, Emma Broderick, Joanne Brown, Heather Burkett-Murphy, Holly

Burkhart, Hilary Cecile, Mackenzie Cogle, Ashley Courtney, Angelina da Gama,

Sarah Dahan, Hope Daley-Derry, Robin Daniels, Roxanna De la Cruz, Katherine

Donnelly, Brianda Earle, Monica Easily, Jacob Eisen, Michelle Estrada, Sandra

Ferguson, Amanda Fontenot, Denisha Freeman, Heather Garon, Jennifer Georgeson,

Alana Green, Nicole Hoff, Monica Hollifield individually and on behalf of S. H.,

Lauren Hudson, Tiffany Huval, Aleha Ingle, Heather Jackson, Khila James, Kat Johnston, Jessica Jones individually and on behalf of P. J., Eunice Kahler, Tanya Karakasheva, Kathleen Keehner, Liza Krengel, Anna Kurilova, Julia Leon, Kristie Letizia, Tina Lewis, Laura Llewellyn, Stacey Lobdell, Llasmin Lozoya, Lyana Luciano, Kim Marietta, Theresa McCormack, Leslie McDonald, Lisa Mendez, Jill Mooshagian, Jennifer Morgan, Amanda Murphy, Jessica Nguyen, Leslie Orr, Heather Passmore, Sylva Pate, Sara Petty, Danielle Phelps, Erica Pilicy-Ryan, Robin Poston, Nicole Quenga, Melinda Quinn, Charity Reddish, Natalie Register, Jean Riccio, Sarah Richardson, Heather Rife, Alexa Roemer, Felicia Sanchez, Amy Shay, Farzana Siddiquei, Danielle Sigmon, Rhiannon Singer, Jodi Sobiech, Maria Sokolova, Debra Sterlacci, Miecha Isys Thomas, Vanessa Tocco, Noel Talerico, Marina Tolic, Leslie Tolstoy, Alexandra Urresti, Rebekah Valentine, Tanya Vallejo, Jerrika Vega, Christina Ventor, Robin Vogt, Terri Witts, Robin Yeager and Maureen Zavatone (collectively, "Plaintiffs") file this First Amended Complaint against Defendant Olaplex Holdings, Inc. and Cosway Co., Inc. (collectively, "Defendant") and respectfully state as follows:

## <u>NATURE OF THE ACTION</u>

1.     Plaintiffs have sustained personal and economic injury in connection with and as a result of their purchase and use Olaplex hair care products, including, but not limited to Olaplex No. 0, No. 1, Olaplex No. 2, Olaplex No. 3, Olaplex No.

4, Olaplex No. 5, Olaplex No. 6, Olaplex No. 7, Olaplex No. 8 and Olaplex No. 9 (the "Products"). Defendants jointly designed and manufactured the Products Defendant Olaplex Holdings, Inc. ("Olaplex")  marketed, distributed and sold the Products.

2.     By this action, Plaintiffs seek redress for their personal injuries, primarily to their hair and scalp.  Plaintiffs also seek redress for, and to stop, Defendant's unfair, false and deceptive advertising and marketing of the Products.

## JURISDICTION AND VENUE

3.     The Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332(a), because this is a lawsuit brought by more than 100 plaintiffs in which over $75,000 is at issue per individual and over $5 million is at issue in the aggregate and many Plaintiffs are citizens of states other than Defendant's state of citizenship.

4.     This Court also has personal jurisdiction over Olaplex because Olaplex maintains its principal place of business in the District and has continuous, systematic, and substantial contacts within this District and California. Further, Olaplex has committed unlawful and tortious acts in this District and California that it knew or should have known would cause injury to Plaintiffs—acts which give rise to the causes of action asserted in this lawsuit. Olaplex engages in the wrongdoing alleged in this Complaint throughout the United States, including California and Defendant's Products are advertised, marketed, distributed, and sold throughout this

District and across the State of California. Defendant is authorized to do business in California and has sufficient minimum contacts with California and/or otherwise has intentionally availed itself of the laws and markets of California, rendering the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. Moreover, Olaplex engages in substantial and regular activity within California.

5.      This Court also has personal jurisdiction over Cosway because Cosway is incorporated in California, maintains its principal place of business in California and otherwise avails itself of the privilege of doing business in this District and California.

6.      Venue is proper pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to the claims asserted in this Complaint occurred in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(c) because Defendants (1) conduct substantial business in this District, including, but not limited to, a) the design and manufacture of the Products; b) compilation and evaluation of data to inform its advertising and promotional campaigns; c) solicitation and engagement of retailers, hair salons, hair stylists, influencers, Products ambassadors and paid celebrity endorsers; d) testing of the Products; and e) sale of the Products, (2) have sufficient minimum contacts with this District, and (3) otherwise purposely avail themselves of the privilege of conducting business in this District, through the

promotion, sale, and marketing of the Products in this District.

## PARTIES

7.        Plaintiff Michelle Alabahae is a citizen of Florida, residing in Tamarac, Florida.

8.        Plaintiff Chelsea Aranjo is a citizen of New Jersey, residing in Mountainside, New Jersey.

9.        Plaintiff Megan Arcadi is a citizen of Florida, residing in St. Petersburg, Florida.

10.       Plaintiff Jessica Auriana is a citizen of New York, residing in Poughkeepsie, New York.

11.       Plaintiff Juliette Ball is a citizen of Michigan, residing in Port Huron, Michigan.

12.       Plaintiff Chelsea Balmer is a citizen of Canada, residing in Kamloops, British Columbia, Canada.

13.       Plaintiff Rebecca Barnhouse is a citizen of Texas, residing in Livingston, Texas.

14.       Plaintiff Tiffany Berry is a citizen of Texas, residing in El Paso, Texas.

15.       Plaintiff Donna Bowen is a citizen of West Virginia, residing in Ona, West Virginia.

16.       Plaintiff Ashley Branning is a citizen of North Carolina, residing in

Concord, North Carolina.

17.    Plaintiff Emma Broderick is a citizen of New York, residing in Baldwin, New York.

18.    Plaintiff Joanne Brown is a citizen of England, residing in Tadley Hampshire, England.

19.    Plaintiff Heather Burkett-Murphy is a citizen of Florida, residing in Royal Palm Beach, Florida.

20.    Plaintiff Holly Burkhart is a citizen of Pennsylvania, residing in Kennett Square, Pennsylvania.

21.    Plaintiff Cecile Hilary is a citizen of Oregon, residing in Portland, Oregon.

22.    Plaintiff Mackenzie Cogle is a citizen of Alabama, residing in Birmingham, Alabama.

23.    Plaintiff Ashley Courtney is a citizen of Florida, residing in Pensacola, Florida.

24.    Plaintiff Angelina da Gama is a citizen of Arkansas, residing in Fayetteville, Arkansas.

25.    Plaintiff Sarah Dahan is a citizen of Florida, residing in Aventura, Florida.

26.    Plaintiff Hope Daley-Derry is a citizen of New York, residing in New

York City, New York.

27.    Plaintiff Robin Daniels is a citizen of Texas, residing in League City, Texas.

28.    Plaintiff Roxanna De la Cruz is a citizen of Texas, residing in Edinburg, Texas.

29.    Plaintiff Katherine Donnelly is a citizen of California, residing in San Francisco, California.

30.    Plaintiff Brianda Earle is a citizen of Indiana, residing in Albion, Indiana.

31.    Plaintiff Monica Easily is a citizen of Texas, residing in Houston, Texas.

32.    Plaintiff Jacob Eisen is a citizen of Illinois, residing in Chicago, Illinois.

33.    Plaintiff Michelle Estrada is a citizen of California, residing in Fontana, California.

34.    Plaintiff Sandra Ferguson is a citizen of Texas, residing in McKinney, Texas.

35.    Plaintiff Amanda Fontenot is a citizen of New Jersey, residing in Jersey City, New Jersey.

36.    Plaintiff Denisha Freeman is a citizen of New Jersey, residing in Rahway, New Jersey.

37.    Plaintiff Heather Garon is a citizen of New York, residing in

Lagrangeville, New York.

38.    Plaintiff Jennifer Georgeson is a citizen of Ohio, residing in Millbury, Ohio.

39.    Plaintiff Alana Green is a citizen of California, residing in Los Angeles, California.

40.    Plaintiff Nicole Hoff is a citizen of Idaho, residing in Meridian, Idaho.

41.    Plaintiff Monica Hollifield is a citizen of California, residing in Irvine, California.

42.    Plaintiff S. H., a minor, is a citizen of California, residing in Irvine, California.

43.    Plaintiff Lauren Hudson is a citizen of Virginia, residing in Salem, Virginia.

44.    Plaintiff Tiffany Huval is a citizen of Louisiana, residing in Abbeville, Louisiana.

45.    Plaintiff Aleha Ingle is a citizen of Texas, residing in San Antonio, Texas.

46.    Plaintiff Heather Jackson is a citizen of Missouri, residing in Camdenton, Missouri.

47.    Plaintiff Khila James is a citizen of New York, residing in Bronx, New York.

48.     Plaintiff Kat Johnston is a citizen of Hawaii, residing in Kihei, Hawaii.

49.     Plaintiff Jessica Jones is a citizen of Maryland, residing in Perry Hall, Maryland.

50.     Plaintiff P. J., a minor, is a citizen of Maryland, residing in Perry Hall, Maryland.

51.     Plaintiff Eunice Kahler is a citizen of Missouri, residing in Springfield, Missouri.

52.     Plaintiff Tanya Karakasheva is a citizen of Bulgaria, residing in Burgas, Bulgaria.

53.     Plaintiff Kathleen Keehner is a citizen of Georgia, residing in Savannah, Georgia.

54.     Plaintiff Liza Krengel is a citizen of Texas, residing in Plano, Texas.

55.     Plaintiff Anna Kurilova is a citizen of Arizona, residing in Mesa, Arizona.

56.     Plaintiff Julia Leon is a citizen of California, residing in Vallejo, California.

57.     Plaintiff Kristie Letizia is a citizen of Illinois, residing in Lombard, Illinois, Florida.

58.     Plaintiff Tina Lewis is a citizen of Maryland, residing in Lutherville, Maryland.

59.     Plaintiff Laura Llewellyn is a citizen of Texas, residing in Houston, Texas.

60.     Plaintiff Stacey Lobdell is a citizen of Ohio, residing in Sunbury, Ohio.

61.     Plaintiff Llasmin Lozoya is a citizen of California, residing in Modesto, California.

62.     Plaintiff Lyana Luciano is a citizen of New York, residing in Buffalo, New York.

63.     Plaintiff Kim Marietta is a citizen of Texas, residing in Baytown, Texas.

64.     Plaintiff Theresa McCormack is a citizen of New York, residing in Lynbrook, New York.

65.     Plaintiff Leslie McDonald is a citizen of Kansas, residing in Overland Park, Kansas.

66.     Plaintiff Lisa Mendez is a citizen of Michigan, residing in New Boston, Michigan.

67.     Plaintiff Jill Mooshagian is a citizen of California, residing in Caramillo, California.

68.     Plaintiff Jennifer Morgan is a citizen of Michigan, residing in Holly, Michigan.

69.     Plaintiff Amanda Murphy is a citizen of Michigan, residing in Midland, Michigan.

70.     Plaintiff Jessica Nguyen is a citizen of California, residing in Stockton, California.

71.     Plaintiff Leslie Orr is a citizen of Utah, residing in Hurricane, Utah.

72.     Plaintiff Heather Passmore is a citizen of Canada, residing in Coldstream, British Columbia, Canada.

73.     Plaintiff Sylva Pate is a citizen of New York, residing in Yonkers, New York.

74.     Plaintiff Sara Petty is a citizen of New York, residing in Larchmont, New York.

75.     Plaintiff Danielle Phelps is a citizen of North Carolina, residing in Charlotte, North Carolina.

76.     Plaintiff Erica Pilicy-Ryan is a citizen of Connecticut, residing in Prospect, Connecticut.

77.     Plaintiff Robin Poston is a citizen of South Carolina, residing in Florence, South Carolina.

78.     Plaintiff Nicole Quenga is a citizen of Arizona, residing in Phoenix, Arizona.

79.     Plaintiff Melinda Quinn is a citizen of Vermont, residing in Bomossenn, Vermont.

80.     Plaintiff Charity Reddish is a citizen of Georgia, residing in Brunswick,

Georgia.

81.     Plaintiff Natalie Register is a citizen of New York, residing in Ridgewood, New York.

82.     Plaintiff Jean Riccio is a citizen of New Jersey, residing in East Brunswick, New Jersey.

83.     Plaintiff Sarah Richardson is a citizen of North Carolina, residing in Greensboro, North Carolina.

84.     Plaintiff Heather Rife is a citizen of Florida, residing in Fort Myers, Florida.

85.     Plaintiff Alexa Roemer is a citizen of New York, residing in New York City, New York.

86.     Plaintiff Felicia Sanchez is a citizen of California, residing in Lakewood, California.

87.     Plaintiff Amy Shay is a citizen of Pennsylvania, residing in Bethel Park, Pennsylvania.

88.     Plaintiff Farzana Siddiquei is a citizen of New Jersey, residing in Atlantic City, New Jersey.

89.     Plaintiff Danielle Sigmon is a citizen of Florida, residing in St. Petersburg, Florida.

90.     Plaintiff Rhiannon Singer is a citizen of Michigan, residing in Munising,

Michigan.

91.    Plaintiff Jodi Sobiech is a citizen of New York, residing in Warwick, New York.

92.    Plaintiff Maria Sokolova is a citizen of Spain, residing in Barcelona, Spain.

93.    Plaintiff Debra Sterlacci is a citizen of New York, residing in Babylon, New York.

94.    Plaintiff Noel Talerico is a citizen of New Jersey, residing in Milltown, New Jersey.

95.    Plaintiff Miecha Isys Thomas is a citizen of New York, residing in Brooklyn, New York.

96.    Plaintiff Vanessa Tocco is a citizen of Florida, residing in Lake Worth Beach, Florida.

97.    Plaintiff Marina Tolic is a citizen of Australia, residing in Morningside, Queensland.

98.    Plaintiff Leslie Tolstoy is a citizen of Oregon, residing in McMinnville, Oregon.

99.    Plaintiff Alexandra Urresti is a citizen of Idaho, residing in Middleton, Idaho.

100.    Plaintiff Rebekah Valentine is a citizen of Texas, residing in Boerne,

Texas.

101.    Plaintiff Tanya Vallejo is a citizen of California, residing in Chula Vista, California.

102.    Plaintiff Jerrika Vega is a citizen of Massachusetts, residing in Lynn, Massachusetts.

103.    Plaintiff Christina Ventor is a citizen of California, residing in Huntington Beach, California.

104.    Plaintiff Robin Vogt is a citizen of New York, residing in Lindenhurst, New York.

105.    Plaintiff Terri Witts is a citizen of New Jersey, residing in Milltown, New Jersey.

106.    Plaintiff Robin Yeager is a citizen of Ohio, residing in Broadview Heights, Ohio.

107.    Plaintiff Maureen Zavatone is a citizen of Connecticut, residing in Old Saybrook, Connecticut.

108.    Olaplex is a Delaware corporation with its principal place of business in California. Olaplex may be served through its registered agent, JeE Wong, President, Olaplex Holdings, Inc., at 1187 Coast Village Rd, Suite 1-520, Santa Barbara, CA 93108.

109.    Cosway is a California corporation with its principal place of business

in California. It may be served through its registered agent, Richard L. Hough, Chief

Executive Officer, Cosway Co, Inc., 20633 S Fordyce Ave., Carson, CA 90810.

## FACTUAL BACKGROUND

110.    Olaplex and Cosway designed and manufactured the Products. Olaplex

marketed, sold and distributed the Products throughout the world at all times

relevant to this Complaint.

111.    When it comes to beauty products sold in the U.S., there is an absence

of regulation setting standards for the use of formaldehyde and similar allergens and

the U.S. Food and Drug Administration ("FDA") has little authority.[1] The law does

not require cosmetic companies to share formulae, testing or adverse event

information with the FDA—before or after the product is placed on the market.

Consumers have no choice but to depend on the product makers and sellers to

honestly represent their products and ensure consumer safety.

112.    Defendants have failed to protect consumers by making false claims

about the Products and by failing to ensure the Products are safe.

## False Claims About the Products

113.    Defendants design and market the Products as hair care products

primarily for consumers with dry and damaged hair or hair. More particularly,

---

[1]    *See*    https://www.fda.gov/cosmetics/cosmetics-laws-regulations/fda-authority-
over-cosmetics-how-cosmetics-are-not-fda-approved-are-fda-regulated

Olaplex, which is headquartered in Los Angeles County, California, makes the following representations concerning the Products on its website, in social media, such as Facebook and Instagram, and in other marketing materials aimed at consumers as well as in literature and sales materials its provides to retailers, hair salons, hair stylists, influencers, brand ambassadors, paid celebrity endorsers and others it engages to promote and sale the Products: (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, DEA, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!"[2]

114.   By repeating these claims over and over on its website, in social media pages and sponsored placement ads online and in magazines, Defendants bank on the psychological concept known as the "illusion of truth."  The more you repeat a claim, the more likely your audience is to believe it is true.

115.   In fact, the Products are none of these things.

**Design Defects of the Products**

116.   In addition to making false claims about the Products, Defendants have

---

[2]      www.olaplex-me.com/faq.php;      https://olaplex.com/pages/how-it-works;  https://youtu.be/fEboj5Rdczg?t=107;  and  https://olaplex.com/pages/frequently-asked-questions.

failed to adhere to minimum standards for the cosmetic industry in the way they design the Products.

117.   Multiple varieties of the Products, including No. 3, contain or have until recently contained lilial, an ingredient that, according to a recorded Instagram video featuring Lavinia Popescu, Olaplex Chief Scientist, VP R&D + Regulatory, Olaplex knew to be a sensitizer and allergen.[3] Many more of the Products contain panthenol and other ingredients known for some time by the beauty industry to be allergens and irritants. These sorts of ingredients lead to allergic contact dermatitis ("ACD") and resulting hair loss and scalp injuries.

118.   Olaplex's use of lilial has even more serious implications. Olaplex sells the Products worldwide. In 2020, the European Union Scientific Committee on Consumer Safety ("SCCS") demanded lilial be phased out of use in hair and beauty products by March 2022. Our review of archived websites shows that Sephora removed lilial from the No. 3 ingredient list in approximately June 2021. This indicates that, as early as 2020 or early 2021, Sephora required Olaplex to remove lilial in those Products sold to Sephora. Nevertheless, according to its own public statements, Olaplex did not remove the ingredient more generally in Products sold in the US and EU until February 2022.

---

[3]   Embedded   at   https://fashionista.com/2022/03/olaplex-infertility-controversy-ingredient-reformulation.

119.   Even then, Olaplex failed to take the problematic lilial-containing Products off the market. Olaplex should have recalled the dangerous Products, requiring that retailers and distributors either (1) return these Products, or (2) destroy them and provide proof of destruction. Instead, we understand Olaplex continues to sell and allows retailers and distributors to continue to sell the runoff inventory it knows contains a dangerous ingredient.

120.   By way of another example, many varieties of the Products contain sodium benzoate and ascorbic and/or citric acid. These chemicals combine to create the molecule benzene. Benzene is a known carcinogenic. In other words, it causes cancer. The ingredient is so dangerous that the beauty industry has stopped using the ingredient and voluntarily recalled hair care products containing benzene. Olaplex has not.

121.   In yet another example of design defect, the Products contain non-water-soluble substances that consumers are directed or encouraged to leave in the hair for extended periods, users develop clogged, inflamed, impacted and infected hair follicles—in other words, Seborrheic Dermatitis ("SD"), characterized by red, itchy, inflamed, blistered, flaking or scaling skin as well as hair loss.  The American Hair Loss Association explains:

> Although all this inflammation is not specifically directed at the hair follicle, if hair follicles are in the vicinity of the inflammatory cells then they can still be adversely affected. Hair follicles find inflamed skin an unhealthy environment in which to grow. Thus seborrheic

dermatitis may non-specifically cause diffuse hair loss.[4]

122.   Healthy hair follicles release natural oils that make their way from the follicle down the hair shaft. This process helps keep hair strong, moisturized, free from frizz and shiny. Clogged hair follicles disrupt the hair's natural lubrication process, causing the hair to become dry, brittle, frizzy, dull, split and highly vulnerable to breakage.

123.   Clogged hair follicles also lead to yeast and bacterial infections as microbes have been shown to increase with SD and thrive on the conditioning agents found in the Products and other dirt and debris that becomes impacted.[5]

124.   Each variety of the Products contain known skin irritants and sensitizers, which constitute another example of design defect. These irritants cause ACD. ACD leads to extreme diffuse hair loss according to treating physicians[6] and researchers.[7] As one Yale trained dermatologist explained,

> [I]f the scalp gets inflamed enough from the use of a cosmetic product, hair loss can certainly be a symptom. The condition is called allergic contact dermatitis (ACD), and it causes irritated, often itchy, red rashes in areas of contact with various chemical products. Preservatives, dyes, surfactants, fragrances, and plant extracts are among the common ingredients that cause this problem.[8]

---

[4] *Id.*

[5] *See* American Hair Loss Association, *Seborrheic Dermatitis*.

[6] *See* Dr. Mona Gohara, Your Conditioner Could Actually be Causing Hair Loss, Fitness.

[7] Dr. Antonella Tosti, et al., *Telogen Effluvium After Allergic Contact Dermatitis of the Scalp*, Arch Dermatol., February 2001.

[8] *See* Your Conditioner Could Actually be Causing Hair Loss, *supra*.

125.   This just makes common sense.

126.   In more serious cases, exposure to these sorts of allergens trigger a more systemic auto immune disease, such as alopecia areata, an auto-immune related hair loss. As discussed by the National Association of Alopecia Areata, a non-profit that "educates the public about alopecia areata,"[9] although its cause is still somewhat uncertain, alopecia areata is a condition understood at this time to be triggered by, among other things, external substances, such as allergens.[10] Just as with allergic contact dermatitis, the exposure stimulates the body's immune system, causing it to mistake—and attack— normal cells for foreign invaders.[11]

127.   The Products design is further defective in its overuse of plasticizing agents, such as glycol. Far from repair dry and damaged hair, overuse of these plasticizing ingredients weakens hair and actually causes hair damage.

128.   Defendants' instructions for use of the Products exacerbate these injuries. Defendants direct and/or encourage consumers to leave the Products in their hair for long periods of time or indefinitely. For instance, Defendant's tell consumers that No. 3—the best seller and cornerstone of the Products—"reaches its max efficacy at 30-45 minutes however OLAPLEX is actively working in the hair

---

[9] Nat'l Alopecia Areata Foundation, *About NAAF*, https://www.naaf.org/about.
[10] *See* Nat'l Alopecia Areata Foundation, *What You Need to Know About Alopecia Areata*, https://www.naaf.org/alopecia-areata.
[11] *See id.*

as long as the hair remains moist."[12] In the Frequently Asked Questions section of the Olaplex website, Defendants go even farther: "we have received great feedback from people who have" slept in an Olaplex treatment.[13] Defendants coyly hedge a bit in this, explaining, "[a]s a company, we do not recommend sleeping in OLAPLEX treatments," but only because "it could get into your eyes."[14] Defendants never warn that the longer a consumer's exposure to problematic ingredients in the Products, the greater the risk of SD, ACD or the damaging effects of plasticizing agents.

**False, Misleading and Unconscionable Business Practices**

129.   Defendants also engage in sharp business practices, which like their false claims about the Products, mislead consumers as to the Products' efficacy and safety.

130.   Defendants claim the Products enjoy wild popularity and celebrity endorsement.  The Olaplex website names celebrities it claims use and endorse the Products and use celebrity photos as part of its marketing. On information and belief, many of these celebrities do not regularly use the Products, do not sponsor or endorse the Products and are, in fact, unaffiliated with the Products or Defendants in any way. Those celebrities who have used the Products have done so once or

---

[12] https://olaplex.com/pages/frequently-asked-questions.
[13] https://olaplex.com/pages/frequently-asked-questions.
[14] *Id.*

twice or sporadically, primarily because Defendants offer the Products to them for free or based on some other incentive.

131.   Defendants reinforce these surreptitious celebrity endorsements with "Transformation" pictures, showing before and after photos on their websites that purport to demonstrate how the average person can attain celebrity hair as their own. However, these "average" people are actually paid models who do not regularly use the Products as recommended by Defendants and, unbeknownst to consumers, Plaintiffs, in particular, the posted pictures show hair that has been styled by a professional.

132.   In that same vein, Defendants pay to have the Products featured in magazines and then brag about the press coverage, never disclosing the coverage amounts to no more than a purchased ad.  Defendants also pay for mentions on blogs and in other social media, using influencers, usually those influencers who identify as members of the curly hair community and dedicate a significant portion of their content to hair repair, maintenance, routines and other tutorials. An influencer accepts payment to promote a particular good or service on social media, such as Instagram, YouTube and/or Twitter, for which they have a large audience. Defendants hires influencers as part of its overall marketing strategy and works closely with these influencers to produce the Products-related content, providing photos of the Products to be featured and other content material, offering promo

24

codes that the influencer will then offer the influencer's audience, etc. In these ways, Defendants control the content. Defendants compensate influencers by way of commissions on sales of the Products made through "affiliate links" on their social media sites and/or with free Products. Defendants do not disclose to consumers its financial relationship with influencers or their control over the content of its sponsored influencers. Defendants do not require the influencers with whom they work to make such disclosures.

133. Research shows influencer marketing to be quite compelling. Researchers found that influencer advertisement generates 277% greater emotional intensity and 87% higher memory encoding than television ads.[15] In one study, 93% of women, all of whom consider themselves "social media savvy," had purchased something at an influencer's suggestion.[16] Another report found businesses earned an extraordinary 520% return on every dollar spend toward influencer marketing.[17] It is

---

[15] Alexandra J. Roberts, *False Influencing*, Georgetown Law J., p. 4, vol. 109, No. 1, 2020 ("False Influencing") (citing Blake Droesch, What Does Your Brain on Influencer Marketing Look Like?, eMarketer (Aug. 26, 2019) https://www.emarketer.com/contect/your-brain-on-influencers-neuroscience-study-explains-the-effects-of-influencer-marketing [https://perma.cc/5GXUFY8L].

[16] False Influencing, 4 (citing Stefania Pomponi Butler, Social Media and the Female Holiday Shopper (Infographic), BUSINESS2COMMUNITY (Nov. 15, 2012) https://www.business2community.com/social-media/social-media-and-the-female-holiday-shopper-infographic-0332987 [https://perma.cc/U6QW-JF89].

[17] False Influencing, 4 (citing NeoReach, Influencer Marketing Benchmark Report 2019, (Feb. 12, 2019) https://neoreach.com/influencer-marketing-benchmark-report-2019/ [https://perma.cc/QT44-LEM3] and Dominique Jackson, Social Proof:

not surprising then that Olaplex has relied heavily and increasingly on influencer marketing.[18] The apparent authenticity of the influencer marketing drives its success.[19] Consumers find influencers to be much more credible than the brand and, consequently, trust influencers more than even their real-world friends.

134.   Because of the unprecedented power of social media influencers, the Federal Trade Commission (the "FTC") has established strict guidelines for disclosing paid influencing. "When there exists a connection between the endorser and the seller of the advertised product that might materially affect the weight or credibility of the endorsement (i.e., the connection is not reasonably expected by the audience), such connection must be fully disclosed." Guides Concerning Use of Endorsements and Testimonials in Advertising, 16 C.F.R. § 255.5 ("FTC Guidelines").

135.   In addition to its social media promotions and influencer marketing, Defendants offer a less than rigorous *free* online training course, after which a hair stylist can become Olaplex "certified" and begin using—and, of course, selling—

---

How to Use Marketing Psychology to Boost Conversions, SPROUT SOCIAL (May 29, 2018) https://sproutsocial.com/insights/social-proof/ [https://perma.cc/2P39-ZQY9] ("Businesses are averaging $6.50 for every $1 spent on influencer marketing.")).

[18]   *See* https://digiday.com/marketing/engaging-with-our-audience-why-olaplex-is-focusing-on-community-building-via-tiktok-instagram/amp/.

[19]   False Influencing, 3.

the Products.[20]   Defendants promote stylists who complete the training through a directory program found on the Olaplex website and by providing marketing materials and strategy, and stylist support services.

136.   Defendants also sell the Products through major retailers, such as Sephora, Ulta, and Amazon, pursuant to written agreements. Defendants provides these retailers with product descriptions and other promotional materials, which the retailers are required to use in their promotion of the Products.

137.   Defendants plan, create and execute websites, social media accounts, magazine advertising, a community of affiliated salons and stylists, influencers and other brand ambassador programs, apparent endorsements, transformation photos and videos, testimonials, retail suppliers and other direct marketing channels as part of an overall international advertising campaign (the "Campaign").

**Efforts to Conceal Dangers**

138.   Defendants' sharp practices have not stopped there. Defendants have also taken affirmative action to conceal the dangers of the Products and, in these efforts, thwarted Plaintiffs and others from discovering they had suffered cognizable injuries caused by Defendant's wrongful conduct. It never occurred to Plaintiffs and other users that the Products—touted by Defendants as safe for all

---

[20] https://certificate.olaplex.com

hair, free of a laundry list of harsh chemicals and are scientifically formulated and proven to repair dry and damaged hair —could actually be hurting their hair and scalp, not helping. To the contrary, many believed their situation would have been worse but for the Products. Some worried, along with their families, their hair loss, scalp issues and other personal injuries could be symptoms of a dire health condition. Many of them went from doctor to doctor desperate for answers, all to no avail.

139.   Defendant has made matters worse by failing to disclose—indeed, actively concealing— the number of complaints of hair loss, scalp issues and other injuries it has received from customers and, on information and belief, the FDA. Defendants have been dismissive of their customers' hair loss, instead describing hair shedding as normal and unavoidable and attributing the hair loss to a long list of other potential causes. Had Defendants been transparent even in just disclosing the number of complaints, some Plaintiffs and other consumers would have identified the Products as the culprit much sooner, some could have avoided injury altogether and all would have had each other for comfort and support.

140.   Defendants claim testing proves the Products cannot be the cause yet Defendants have refused to provide these so-called test protocols and results. This concealment is highly suspect, especially given Defendants' claims the Products are scientifically formulated and proven.

141.    Although Defendants have received thousands of complaints and learned of countless others through social media and major media outlets, it has failed and refused to formally recall any of the Products. Nor have Defendants issued any new warnings or otherwise disclosed the defects and dangers associated with the Products.

142.    Defendants has undertaken what is essentially a voluntary and entirely self-serving partial recall. Olaplex usually accepts returns and issues refunds for Products under certain limited parameters. However, after concerns about the safety and efficacy of the Products became public, Olaplex has allowed customers to return Products, "no questions asked," for a full refund without regard to the date of purchase and the amount of product left in the returned bottle(s). In so doing, Olaplex hopes to appease injured consumers and sweep under the rug the dangers presented by the Products. This single purpose is made all the more clear by what Olaplex has not done: it has not recalled the Products from retailers and other third party distributors; it has not destroyed or required retailers and other third party distributors to destroy the Products; and it has not reported the many complaints it has received concerning the Products to the FDA or any other regulatory body.

**Plaintiffs' Injuries**

143.    Defects in the Products have caused Plaintiffs serious injury. They have lost their hair—in some cases more than half and leaving bald spots in others. The

29

Products have transformed what hair remains as well. Far from repairing and protecting hair from damage, the Products have instead left Plaintiffs' hair dry, brittle, frizzy and dull. The hair has split and broken, causing it to look unkept and as if it were cut with a weedwhacker. The Products have also changed the texture of Plaintiffs' hair. Even those who once had beautiful defined curls or waves now have frizzy, straight-ish hair. Plaintiffs have suffered scalp injuries, too, including, but not limited to, extreme itchiness, rash, yeast infection, bacterial infection, open sores, burning and overall sensitivity.

144.   Counsel has together with each plaintiff carefully considered all other common cause of hair loss and scalp injuries. In each case, there is no other cause of the injuries; the Products alone are to blame.

145.   The following photographs depict the type of hair loss and scalp injury damage caused by the Products.

















146.   Numerous studies show that the psychological impact of hair loss is often severe and debilitating, especially for women. Hair represents beauty, health, youth, individuality and sexuality. The loss or destruction of hair is closely tied with self-identity and self-confidence. Many people facing hair loss suffer extreme anxiety and depression, some become house bound and studies report cases where hair loss and damage leads to self-harm, eating disorders and other very dangerous and deadly psychological conditions. Each Plaintiff has suffered emotionally as a result of the injuries to their hair and scalp caused by Defendants. The most common of their emotional injuries include, but are not limited to, sleeplessness, a change in appetite, depression, anxiety, irritability, tearfulness, loss of desire to engage in activities they used to enjoy, fear of leaving the house and an inability to focus while struggling with intrusive and obsessive thoughts about their hair and scalp injuries and how they might address them.

147.   These symptoms do not occur in a vacuum. Injuries to a person's sense of self, confidence and well-being impact every aspect of their lives and the dynamics of every relationship. Plaintiffs have struggled in their relationships with friends, partners, children and at work. In some cases, Plaintiffs have lost income due to an inability to work and from loss of opportunities to advance their careers, which requires relationship building.

## PLAINTIFF-SPECIFIC ALLEGATIONS

148.   Plaintiff Michelle Alabahae purchased the Olaplex products between February – April/May 2022 online through Olaplex.com and Amazon.com based on representations regarding the safety, formulation and efficacy of the Products made by Defendants on Olaplex.com and, more generally online, *see supra*, Background Facts, paras. 113-147, before her first purchase, especially claims that the Products "restore[] damaged and compromised hair." Plaintiff used the Products as directed, including the use of #0, #3, #4, #5, #6 and #7.  Plaintiff suffered hair loss, hair breakage, poor hair condition, scalp pain and constant dry and irritated/inflamed scalp.

149.   Plaintiff Chelsea Aranjo purchased the Olaplex products in or around September 2022 online from Sephora based on representations regarding the safety, formulation, and efficacy of the Products made by Defendant through Sephora, on Olaplex.com, and in social media posts through influencers on Instagram, YouTube and Tik Tok (although she cannot recall names), *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements prior to her first purchase of the Products and was especially moved by claims that the Products had a "clean ingredient list" that "do not contain harsh or harmful chemicals, such as "sili-cone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!", and would transform her hair, making it shiny, full, strong,

healthy-looking, and more resilient. Further, Plaintiff relied on claims that the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," and (4) provide the "ultimate break-age insurance." Plaintiff used the Products as directed, including the use of #0, #3, and #6. Plaintiff suffered extreme hair loss from the root (bulb attached at the end), extreme hair breakage, and changes in the texture of her hair where it is now constantly tangled. When she tries to put a brush through her hair, it snaps, and Plaintiff is unable to untangle her hair without experiencing more hair breakage and hair loss. On information and belief, Sephora received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

150. Plaintiff Megan Arcadi purchased the Olaplex products in or around September 2022 – November 2022 in person through Cosmoprof and Trustar based on representations made by Defendants by certain Olaplex Certified hair stylists, *see supra*, Background Facts, paras. 113-147 regarding the safety, formulation and efficacy of the Products, especially claims that the Products would safely and without harmful chemicals: drastically reduce hair breakage, lead to better, healthier hair, protect hair from damage caused by chemical services, builds bonds to replace what was stripped from hair by styling and overall improve hair

texture and quality. Plaintiff used the Products as directed, including the use of #4P, #4, #5 and #6.  Plaintiff suffered hair loss, hair breakage, poor hair condition, hair discoloration, and scalp/facial irritation or rash. The Olaplex-certified stylists on which the Plaintiff are Guy Tang, Gabbie Hanna, Larissa Love, Brad Mondo and Hannah Forcier, who appeared on Facebook, YouTube, Instagram and TikTok. On information and belief, these stylists received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

151.   Plaintiff Jessica Auriana purchased the Olaplex products on August 16, 2022 through her stylist based on representations made on August 16, 2022, and after regarding the safety, formulation and efficacy of the Products made by Defendants through her stylist, Claudia Cruz, and advertisements seen on Instagram, *see supra*, Background Facts, paras. 113-147 before purchasing the Products, especially claims that the Products safely, and without using harsh or harmful chemicals, "restore[] damaged and compromised hair" and are "the best thing for your hair."   Plaintiff used the Products as directed, including the use of #4, #5 and #4P-Purple Clarifying Shampoo. Plaintiff suffered hair loss, balding, itchy scalp, hair texture change, dry hair and depression. Plaintiff's stylist, Claudia Cruise, works at Skye Studio, located at 45 Eastdale Ave. N, Suite 201, Poughkeepsie, NY 12603. Ms. Skye is authorized to sell Olaplex at her salon and,

on information and belief, received marketing materials from Olaplex with directions from Olaplex to use the materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex. Ms. Skye stated that everyone raved/swore by Olaplex and that the Products restore dry, damaged hair and are especially good for color treated hair.

152.   Plaintiff Juliette Ball purchased the Olaplex products between October 2022 through December 2022, online from Amazon based on recommendations from her stepdaughter, who on information and belief, repeated false claims she saw/heard in advertisement by Defendants, see *supra*, Background Facts, paras. 113-147. Plaintiff used the Products as directed, including the use of #3 #4, #5, and #7. Plaintiff suffered hair breakage, bald spots, hair discoloration, hair loss, straw like hair texture, scalp irritation, and rash.

153.   Plaintiff Chelsea Balmer purchased the Olaplex products in or around October 2021 – June 2022 in person from Nurture Hair Salon based on representations regarding the safety, formulation and efficacy of the Products made by Defendants through her hair stylist, Makenna Runge, see *supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) "= strong, healthy-looking, more resilient hair." Plaintiff used the

Products as directed, including the use of #4 and #5. Plaintiff suffered extreme hair loss, itchy scalp, sores/scabbing on scalp, unusual breakage and thinning hair. With regard to statements made by her stylist Makenna Runge, who works at Nurture Hair Salon, 375 4TH Avenue, Kamloops, BC, Canada, that Olaplex restores damaged hair, makes your hair healthy and shiny and makes your hair strong and more resilient. On information and belief, Makenna Runge received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

154.   Plaintiff Rebecca Barnhouse purchased the Olaplex products on or around October 19, 2023, from Tracy at LaBelle Salon Ojai, based on representations made by Defendants by certain certified hair stylists, *see supra*, Background Facts, paras. 113-147, regarding the safety, formulation and efficacy of the Products, especially claims that the Products would safely and without harmful chemicals: drastically reduce hair breakage, lead to better, healthier hair, protect hair from damage caused by chemical services, builds bonds to replace what was stripped from hair by styling and overall improve hair texture and quality. Plaintiff used the Products as directed, including the use of #4, #5, #6, #7, and #8 Plaintiff suffered lost over 50% of volume, breakage, itchy, scalp, and sores on back of neck. On information and belief, this salon received marketing materials from Olaplex with

directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

155.   Plaintiff Tiffany Berry purchased the Olaplex products between March 23, 2021 to April 18, 2021, online through Sephora based on representations regarding the safety, formulation and efficacy of the Products made by Defendants through Sephora, and social media influencers, Doctor Anne, Nadine Baggott, Abbey Yung and Lea Toshiye on YouTube, see *supra*, Background Facts, paras. 113-147. On or about April 18th, 2021, prior to her first purchase of Products #3, #5, and #7, Plaintiff saw/heard and relied on these statements and was especially moved by claims made by Defendant through social media influencer that the Products (1) "restore[] damaged and compromised hair," (2)  create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," and (5) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #3, #4, #5, and #7.  Plaintiff suffered nonstop hair loss (where her hair fell out in clumps), scalp sensitivity including extremely itchiness, hair breakage around the top of her head, and changes in hair texture. Specifically, Plaintiffs hair became very dry, brittle, frizzy, thin and look fried. She has lost between 50%-75% of her hair. To date, Plaintiff continues to suffer hair loss to date.

156.    Plaintiff Donna Bowen purchased the Olaplex products in or around 2021 through 2022, in person from Sephora based on representations regarding the safety, formulation and efficacy of the Products made her stylist and the Defendants on Olaplex.com and, more generally online, see *supra*, Background Facts, paras. 113-147, before her first purchase, especially claims that the Products (1) "restore[] damaged and compromised hair," (2)  create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair."!"  Plaintiff used the Products as directed, including the use of #3, #4, #4P, #5, and #9. Plaintiff suffered hair loss, sore scalp, and extreme hair thinning.

157.    Plaintiff Ashley Branning purchased the Olaplex products from Sephora in 2019 or 2020, and on Amazon between March 2021 through October 2022 based on representations regarding the safety, formulation and efficacy of the Products made by Defendants through a sales associate at Sephora, on Olaplex.com, in social media advertisements, on the bottles of Olaplex products and, more generally online, see *supra*, Background Facts, paras. 113-147, especially claims that the Products (1) "restore[] damaged and compromised hair," (2)  create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by

science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #4, #5, #6 and #7. Plaintiff suffered scalp irritation, including scalp burns and scalp scabbing, hair damage (loss of shine, increased dullness), increased hair breakage, dryer hair, and hair loss amounting to approximately 1/3 to half of hair volume. On information and belief, Sephora received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

158. Plaintiff Emma Broderick purchased the Olaplex products on or about November 26, 2022, online at Olaplex.com based on representations regarding the safety, formulation and efficacy of the Products made by Defendants on Olaplex.com and, more generally online, *see supra*, Background Facts, paras. 113-147, before her first purchase, especially (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!"" Plaintiff used the Products as directed,

including the use of 0, #3, #4, # 4C #5, #6, #7and #8.  Plaintiff suffered hair loss, itchy scalp, and shedding.  On top of her head there is now a huge receding of her hair parting and crown and her hair has thinned out considerably.

159.    Plaintiff Joanne Brown purchased the Olaplex products between June 2021-September 2022 online through Sensational based on representations regarding the safety, formulation and efficacy of the Products made by Defendants through her stylist in June 2021 and, before purchasing the first of the Products, online, including on Olaplex.com, *see supra*, Background Facts, paras. 113-147. Plaintiff heard/saw and relied on these representations and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #3, #4, #5, #6 and #8.  Plaintiff suffered hair loss, hair breakage, scalp/facial irritation or rash, scalp/facial rash and poor hair condition. Plaintiff's stylist worked at Beauty Room, located in Easthampstead Bracknell, UK in June 2021. On information and belief, the stylist and Beauty Room received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in

marketing the Products to potential customers on behalf of Olaplex.

160.    Plaintiff Heather Burkett-Murphy purchased the Olaplex products from the year 2019-2020 at salon Blowout Lounge located at 2793 State Rd 7 #500, Wellington, Fl 33414 and online at Amazon.com based on representations regarding the safety, formulation and efficacy of the Products made by Defendants through a stylist named Adriana Battista, on promotional materials at salon Blowout Lounge, on Olaplex.com, on the Olaplex product bottles, on YouTube and, more generally online, *see supra*, Background Facts, paras. 113-147, before her first purchase, especially claims that the Products (1) "restore[] damaged and compromised hair," (2)  create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #3, #4, and #5.  Plaintiff suffered hair loss, hair breakage, scalp irritation, including itchiness and dryness, hair texture changes from soft to frizzy, brittle, dry, course and like straw. On information and belief, Plaintiff's salon and/or stylist received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

161.     Plaintiff Holly Burkhart purchased the Olaplex products on or around December 2021 and March 2022, from The Salon by Nciolas Castaldi, Chadds ford, PA and from Roots Salon in Kennett Square, PA respectively based on representations regarding the safety, formulation and efficacy of the Products made her stylist and Defendants on Olaplex.com and, more generally online, see *supra*, Background Facts, paras. 113-147, Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #3. Plaintiff suffered bald spots, breakage, and shedding of hair. On information and belief, Plaintiff's salon and/or stylist received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

162.     Plaintiff Hilary Cecile purchased the Olaplex products in or around  September 2020 – July 2022 in person from Moda Studios and Ulta  based on representations regarding the safety, formulation and efficacy of the Products

made by Defendants on the product packaging and in general advertising, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) "= strong, healthy-looking, more resilient hair," (4) provide the "ultimate breakage insurance," and (5) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #3, #4, #4P, #4C, #5, #6, #7, #8 and #9. Plaintiff suffered hair loss, extreme hair breakage and dry/brittle hair. On information and belief, Plaintiff's salon and/or stylist received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

163.    Plaintiff Mackenzie Cogle purchased the Olaplex products between April 11, 2022-June 28, 2022 in person through Ulta based on representations regarding the safety, formulation and efficacy of the Products made by Defendants through claims of celebrity endorsement by Drew Barrymore, on naturallycurly.com and through social media influencers, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these representations before her first purchase of the Products and was especially moved by claims the Products

(1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the products as directed, including the use of #3.  Plaintiff suffered hair loss, hair breakage and dry hair. With regard to statements made by influencers, Plaintiff watched curly hair influencers Manes by Mell and Gena Marie on YouTube in June 2022, who both said that using Olaplex would improve curl pattern. On information and belief, these influencers received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex. On information and belief, Olaplex failed to obtain express authority from Drew Barrymore to claim Ms. Barrymore endorses the Products and/or failed to regularly confirm with Ms. Barrymore that her endorsement remained unchanged.

164.     Plaintiff Ashley Courtney purchased the Olaplex products between in or around November 12, 2022, from her stylist and online from Olaplex website based on representations regarding the safety, formulation and efficacy of the Products made by her stylist and Defendants on Olaplex.com and, more generally online, see *supra*, Background Facts, paras. 113-147, before her first purchase, especially claims

that the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #0, #3, #4 #5, and #8. Plaintiff suffered bald patches, hair loss, breakage, dry and brittle hair, loss of shine, change of hair texture. On information and belief, Plaintiff's salon and/or stylist received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

165.    Plaintiff Angelina da Gama purchased the Olaplex products in or around January 2020 – April 2021 online through Amazon.com based on representations regarding the safety, formulation and efficacy of the Products made by Defendants online, including through Olaplex.com, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage

insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #4, #5 and #6.  Plaintiff suffered hair loss, balding, blisters and anxiety.

Plaintiff Sarah Dahan purchased the Olaplex products on or around February 2021, from Sephora, Ulta, and Olaplex.com based on representations regarding the safety, formulation and efficacy of the Products made Defendants on Olaplex.com and, more generally online, *see supra*, Background Facts, paras. 113-147, before her first purchase, especially claims that the Products (1) "restore[] damaged and compromised hair," (2)  create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #0, #3, #4, #5, #6, #7, and#8. Plaintiff suffered significant hair loss, breakage, and shedding, and emotional distress. With regard to statements made by influencers, Plaintiff watched various influencers on the Olaplex Instagram and Facebook page, who promised hair repair, bond builder, healthier, shinier hair,

deeper repair and stronger hair. On information and belief, these influencers received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex. Plaintiff was motivated to purchase the products because Kim Kardashian was using it.

166.     Plaintiff Hope Daley-Derry purchased the Olaplex products between 2021-2022 at Sephora and CVS based in part on representations regarding the formulation and efficacy of the Products made by Defendants on a bottle of the product, including how the product "strengthens, nourishes and moisturizes" hair. Plaintiff used the Products as directed, including the use of #4, #5, #6 and #7.  Plaintiff suffered major hair loss, scalp burning, itchy scalp, scalp throbbing and pain. Plaintiff felt like someone was pulling her hair out from the root.  Plaintiff also suffered from despair, anxiety, sleep interruption, bouts of crying, sadness, and feelings of hopelessness.

167.     Plaintiff Robin Daniels purchased the Olaplex products between May-August 2022 online through Amazon.com based on representations regarding the safety, formulation and efficacy of the Products made by Defendants online, including through Olaplex.com, Facebook, TikTok and Instagram, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the

Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #0, #3, #4, #5, #6, #7, #8 and #9.  Plaintiff suffered hair loss, hair breakage, poor hair condition, scalp/facial irritation or rash, dandruff and itchy scalp.

168.    Plaintiff Roxanna De la Cruz purchased the Olaplex products between September -December 2022 online through Sephora based on representations regarding the safety, formulation and efficacy of the products made by Defendants on Sephora.com, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these representations before her first purchase and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2)  create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #3, #4, #4P, #5, and #7.  Plaintiff

suffered hair loss, hair breakage and poor hair condition.

169.    Plaintiff Katherine Donnelly purchased the Olaplex products in or around January 2022 online through Olaplex.com based on representations regarding the safety, formulation and efficacy of the Products made by Defendants online, including through Olaplex.com, and social media, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products (1) create "healthy, beautiful, shiny, touchable hair," (2) are "scientifically proven" and "proven by science," (3) "= strong, healthy-looking, more resilient hair," (4) provide the "ultimate breakage insurance," and (5) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #4, #5 and #7.  Plaintiff suffered bald spots, hair thinning, hair loss, depression and anxiety. With regard to statements made by influencers, Plaintiff watched various celebrities including Kim Kardashian, Drew Barrymore, Billie Eilish and JLo , who stated that Olaplex is an amazing product and made their hair healthy.. On information and belief, Olaplex failed to obtain express authority from these celebrities to claim they endorse(s) the Products and/or failed to regularly confirm with them that their endorsement remained unchanged.

170.    Plaintiff Brianda Earle purchased the Olaplex products between July

2022-September 2022 online and in person through Cosmoprof based on representations made by Defendants on Olaplex website *see supra*, Background Facts, paras. 113-147, regarding the safety, formulation and efficacy of the Products before she first purchased the Products, and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #4P, #4, #5 and #6.  Plaintiff suffered hair loss, hair breakage, poor hair condition, hair discoloration, scalp/facial irritation or rash, scalp/facial rash and mental distress.

171.    Plaintiff Monica Easily purchased the Olaplex products in or around October 2022, from Ulta Beauty based on representations regarding the safety, formulation and efficacy of the Products by Defendants on Olaplex.com and, Tic Tok, see *supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products (1) provide the "ultimate breakage insurance," and (2) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea,

aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair."!"  Plaintiff used the Products as directed, including the use of #4, and #5. Plaintiff suffered breakage and extremely dry brittle hair. With regard to statements made by influencers, Plaintiff watched Kim Kardashian, who said that using Olaplex kept her hair strong  is what motivated the Plaintiff to purchase the product. On information and belief, Kardashian received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

172.    Plaintiff Jacob Eisen purchased the Olaplex products between in or around August 2021 - February 2023, in person from RK Salon in Chicago, and online on Amazon.com based on representations regarding the safety, formulation and efficacy of the Products made by Defendant on the product packaging, *see supra*, Background Facts, paras. 113-147, before his first purchase, and by his stylist at  RK Salon, especially claims that the product would repair restore, strengthen and nourish his hair. Plaintiff used the Products as directed, including the use of #4.  Plaintiff suffered hair loss and redness on scalp.

173.    Plaintiff Michelle Estrada purchased the Olaplex products on or around January 2020-February 2023 from Ulta Beauty based on representations regarding the safety, formulation and efficacy of the Products made by Defendants through Ulta and in advertisements on social media, including Instagram, as well as statements

made on Facebook, YouTube, and videos on TikTok viewed prior to purchase in or about December 2019 (although she cannot recall the specific influencers), *see supra*, Background Facts, paras. 113-147 especially claims that the Products (1) "restore[] damaged and compromised hair," (2)  create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #4, #4P, #5, and #7.  Plaintiff suffered hair loss, hair breakage, poor hair condition, hair discoloration, scalp/facial irritation or rash and itchy scalp.

174.    Plaintiff Sandra Ferguson purchased the Olaplex products in or around November 2021 – December 2022 in person from Jayden Grey Salon located in LaJolla, CA, Amaryllis Salon located in Atlanta, GA, Nordstrom and Sephora  based on representations regarding the safety, formulation and efficacy of the Products made by Defendants on the product packaging and in general advertising, through her stylist Lejen Opura, from Jayden Grey Salon in La Jolla, CA and online, including through social media, see *supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products (1) "restore[] damaged and

compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #4, #5, #6 and #9.  Plaintiff suffered dry/brittle hair, texture change, wiry hair, hair breakage, bald spots, thinning hair, dry/itchy scalp, severely broken lifeless hair and scalp sores. With regard to statements made by celebrity endorsements from Kim Kardashian and the "Today Show" Instagram, claiming that Olaplex products are the quintessential hair product for everyone's gorgeous, manageable, healthy hair. Plaintiff's hair stylist Lejen Opura, Jayden Grey Salon, 7940 Herschel Ave., Unit F, La Jolla, CA, claiming that Olpalex thickened your hair, made it shiner, with a bonding multiplier that left your hair dramatically stronger and repairs your hair repairing broken bonds, rejuvenates hair.   On information and belief, the salon, stylist and influencers on whom Plaintiff relied, received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex

175.    Plaintiff Amanda Fontenot purchased the Olaplex products on or about July 29, 2018 online through Sephora and Olaplex.com after having a treatment done

at Love Lane Salon located in Jersey City, NJ, based on representations regarding the safety, formulation and efficacy of the Products made by Defendants through hair stylists at her salon before her first purchase, and by Defendants through influencers including Abbey Yung on social media, Olaplex advertisements, and Sephora advertisements, *see supra*, Background Facts, paras. 113-147, especially claims that the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #0, #3, #4, #5, #6 and #7.  Plaintiff suffered from painful inflammation and swelling of her eyes, bumps and hives on her scalp and hairline, dry and itchy skin, sores on her scalp that were itchy and painful to the touch, hair loss, and hair breakage. On information and belief, Tease It With Taylor salon and influencer Abbey Yung, received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

176.    Plaintiff Deneisha Freeman purchased the Olaplex products on or around November 19, 2022, in person from Ulta Beauty based on representations

regarding the safety, formulation and efficacy of the Products made Defendants on Olaplex.com and, more generally online, *see supra*, Background Facts, paras. 113-147, before her first purchase, especially claims that the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #3, and #6 Plaintiff suffered a large swollen bump near the right temple, small red bumps/inflammation throughout scalp, hair loss and damage.

177.    Plaintiff Heather Garon purchased the Olaplex products in or around June 2020 – May 2022 in person from Cosmoprof and Salon Centric based on representations regarding the safety, formulation and efficacy of the Products made by Defendants on the product packaging and in general advertising, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the

"ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #4P, #6, #7 and #9.  Plaintiff suffered hair loss, extreme hair breakage and dry/brittle hair.

178.     Plaintiff Jennifer Georgeson purchased the Olaplex products on or around July 22, 2021, online from Olaplex website and Zulily based on representations regarding the safety, formulation and efficacy of the Products made Defendants on Olaplex.com and, more generally online, *see supra*, Background Facts, paras. 113-147, before her first purchase, especially claims that the Products (1) "restore[] damaged and compromised hair," (2)  create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #4, and #5. Plaintiff suffered hair loss, hair breakage and emotional distress.

179.     Plaintiff Alana Green purchased the Olaplex products in or around September 2021 – December 2022 in person from Ulta based on representations regarding the safety, formulation and efficacy of the Products made

by Defendants on the product packaging and in general advertising, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #4, #5, #6, #7, #8 and #9  Plaintiff suffered hair loss.

180.    Plaintiff Nicole Hoff purchased the Olaplex products in or around  April 2020 – April 2021 in person from Cosmoprof based on representations regarding the safety, formulation and efficacy of the Products made by Defendants on the product packaging and in general advertising and online, including through social media, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals,

such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #3, #4, #5 and #7. Plaintiff suffered hair loss, extreme hair breakage, dry/frizzy hair and emotional distress. With regard to statements made by influencers, Plaintiff watched Hairby_chrissy in March 2020, who stated that Olaplex is great for blondes, will repair and give you that shiny healthy-looking hair. On information and belief, these influencers received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

181. Plaintiff Monica Hollifield purchased the Olaplex products in or around November 2021 – November 2022 online from Olaplex.com based on representations regarding the safety, formulation and efficacy of the Products made by Defendants online, including through Olaplex.com, and social media, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) "= strong, healthy-looking, more resilient hair," (4) provide the "ultimate breakage insurance," and (5) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the

Products as directed, including the use of #0, #3, #4, #4P, #5, #6, #7 and #9. Plaintiff suffered hair loss, extreme hair breakage and dry/brittle hair.

182. Plaintiff S. H., a minor, purchased the Olaplex products in or around September 2022 in person from Sally Beauty based on representations regarding the safety, formulation and efficacy of the Products made by Defendants online, including through Olaplex.com, and social media, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #0, #3, #4, #4P, #5, #6, #7 and #9. Plaintiff suffered hair loss, extreme hair breakage and dry/brittle hair.

183. Plaintiff Lauren Hudson purchased the Olaplex products between February 2022-November 2022 online through Ulta based on representations regarding the safety, formulation and efficacy of the Products made by Defendants through social media influencer Abbey Yung on YouTube, *see supra*,

Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products, and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #3, #4 and #5. Plaintiff suffered hair loss, scalp/facial irritation or rash, poor hair condition, hair breakage and hair discoloration. On information and belief, influencer Yung received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

184.    Plaintiff Tiffany Huval purchased the Olaplex products between March-October 2022 online through Amazon.com based on representations regarding the safety, formulation and efficacy of the Products made by Defendants on Olaplex.com and TikTok, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products, and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically

proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #0, #3, #4, #5, #6 and #8. Plaintiff suffered hair loss, hair breakage and poor hair condition.

186. Plaintiff Aleha Ingle purchased the Olaplex products in or around January 2022 – January 2023 online from Sephora and Ulta based on representations regarding the safety, formulation and efficacy of the Products made by Defendants online, including through Olaplex.com, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," and (5) provide the "ultimate breakage insurance." Plaintiff used the Products as directed, including the use of #0, #3, #4, #5, #6, #7, #8 and #9. Plaintiff suffered massive hair breakage at the scalp and was forced to shave the left side of her head On information and belief, Sephora and Ulta received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential

customers on behalf of Olaplex.

187.   Plaintiff Heather Jackson purchased the Olaplex products between December 2021, from Olaplex.com based on representations regarding the safety, formulation and efficacy of the Products made by Defendants on Olaplex.com and, more generally online, see supra, Background Facts, paras. 113-147, before her first purchase, especially claims that the Products (1) create "healthy, beautiful, shiny, touchable hair," (2) "= strong, healthy-looking, more resilient hair", and (3) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!". Plaintiff used the Products as directed, including the use of #0, #1, #2, #3, #4, and #5.   Plaintiff suffered brittle hair, breakage to the crown, change of hair texture, natural curls disappeared, and loss of hair density 50-60%.   Lot of breakage around my crown and front.

188.   Plaintiff Khila James Plaintiff Khila James purchased the Olaplex products on or about  December 2022 online through Sephora.com based on representations regarding the safety, formulation and efficacy of the Products made by Defendants online, including through Sephora.com, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) "= strong, healthy-looking, more

resilient hair." Plaintiff used the Products as directed, including the use of #0, #3, #4, #5, #6, #7, #8 and #9.  Plaintiff suffered hair loss, extreme hair breakage and balding.

189.   Plaintiff Kat Johnston purchased the Olaplex products between July 2022-September 2022 online through Nordstrom based on representations regarding the safety, formulation and efficacy of the Products made by Defendants through her stylist Leah Johnston *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the products, and was especially moved by claims the Products (1)  create "healthy, beautiful, shiny, touchable hair," (2) are "scientifically proven" and "proven by science," (3) "= strong, healthy-looking, more resilient hair," (4) provide the "ultimate breakage insurance," and (5) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #4 and #5 after the stylist had used the bonder in the salon.  Plaintiff suffered hair loss, hair breakage, poor hair condition, hair discoloration, burning and itchy scalp, scalp/facial irritation or rash and scalp/facial rash. In addition, Plaintiff has suffered from major depression. Plaintiff's stylist Leah Johnston owns the Hair Hale, 2580 Kekaa Drive #123, Lahaina, Hawaii 96761, where they live and breathe Olaplex. Leah not only said all the phrases mentioned above, but she also stated that Olaplex would make her hair even more beautiful than it already was and stronger, too. Leah refused to

see clients unless they used Olaplex.  On information and belief, Plaintiff's stylist received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

190. Plaintiff Jessica Jones purchased the Olaplex products between in or around January 2021-December 2022 online through Olaplex.com. and the CosmoProf website based on representations regarding the safety, formulation and efficacy of the Products made by Defendants through Olaplex.com, Facebook, email, on the product packaging, in general advertising online and through her stylist located at 1230 Brocatos Hair Salon 2109 Greenspring Dr Timonium MD 21093, *see supra*, Background Facts, paras. 113-147, before her first purchase, especially claims indicating that the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #0, #1, #2, #3, #4, #5, #6, #7., #8, and 4-in-1 Olaplex Bond. Plaintiff suffered skin lesion, itchy scalp, massive dandruff, hair breaking and falling out, emotionally depressed and insecure. With regard to statements made by

influencers, Plaintiff watched various influencers on Olaplex.com, on Facebook and in other advertisements for Olaplex products, including from companies like Sephora, who promised hair repair, bond builder, healthier, shinier hair, deeper repair and stronger hair. On information and belief, these influencers received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

191. Plaintiff P. J. is a minor whose mother, Plaintiff Jessica Jones, purchased the Olaplex products between in or around January 2021-December 2022, online from Olaplex, Inc. and the CosmoProf based on representations regarding the safety, formulation and efficacy of the Products made by Defendants online through Olaplex.com, Facebook, Pinterest, Instagram, and Tik Tok, seen/heard in Sephora and Ulta, made by her stylist at John James Salon located at 130 Lubrano Dr #100 Annapolis, MD 21401, and made more generally online, *see supra*, Background Facts, paras. 113-147, before her first purchase, especially claims such as how the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten,

parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #0, #1, #2, #3, #4, #5, #6, #7., #8, and 4-in-1 Olaplex Bond. Plaintiff suffered itchy dry scalp, extremely dry hair, breakage, bullied by girls at school, sadness, depression, embarrassment, and insecurity. With regard to statements made by influencers, Plaintiff watched Alexa Mcmanama and Trissity in or around 2021, and heard from her stylist statements including that Olaplex solves hair breakage. These statements motivated the Plaintiff to purchase the product. On information and belief, these influencers received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

192.   Plaintiff Eunice Kahler purchased the Olaplex products between July 2022-September 2022 in person through Ulta based on representations made by Defendants on Olaplex displays in Ulta, on the Sephora app and pop-up ads on Facebook and Instagram, *see supra*, Background Facts, paras. 113-147, regarding the safety, formulation and efficacy of the Products, especially claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe

for all hair!" Plaintiff used the Products as directed, including the use of #4P, #4, #5 and #6. Plaintiff suffered hair loss, hair breakage, poor hair condition, hair discoloration, scalp/facial irritation or rash, scalp/facial rash, hair texture and mental distress.

193. Plaintiff Tanya Karakasheva purchased the Olaplex products in or around October 2022 online through Notino.bg based on representations regarding the safety, formulation and efficacy of the Products made by Defendants online, including through Olaplex.com, and social media, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) are "scientifically proven" and "proven by science," and (3) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #1 and #2. Plaintiff suffered severe hair breakage and lost 8-9 cm in length.

194. Plaintiff Kathleen Keehner purchased the Olaplex products in or around November 2022 in person from Salon Centric based on representations regarding the safety, formulation and efficacy of the Products made by Defendants online, including through Olaplex.com, and social media, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her

first purchase of the Products and was especially moved by claims the Products (1) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #4 and #5.  Plaintiff suffered bald patches, receding hairline, extreme scalp tenderness, skin peeling, emotional distress, anxiety, insecurity and loss of sense of self. With regard to statements made by influencers, Plaintiff watched @pacolatorre, Paco is an Ambassador for Olaplex,  on Instgram in August 2022 who offered clients Olaplex treatments and their hair was always shiny and soft after using Olaplex. On information and belief, these influencers received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

195. Plaintiff Liza Krengel purchased the Olaplex products between November 24, 2021 – September 2022 from Dallas, TX based Olaplex Certified stylists Rhonda Wright and DeAnna Rosenblum and at CVS based on representations regarding the safety, formulation and efficacy of the Products made by Defendants through these Olaplex Certified stylists, on Olaplex.com, on Olaplex product bottles, and, more generally online, *see supra*, Background Facts, paras. 42-76, especially claims that the Products "(1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven"

and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!"  Plaintiff used the Products as directed, including the use of #4, #5, #6 and #8.  Plaintiff suffered hair loss, hair breakage and hair thinning. Plaintiff lost more than 50% of her hair.

196.  Plaintiff Anna Kurilova purchased the Olaplex products in December 2021 online through Amazon.com based on representations regarding the safety, formulation and efficacy of the Products made by Defendants on Olaplex.com, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products, and, was especially moved by claims the products (1) create "healthy, beautiful, shiny, touchable hair," and (2) are "scientifically proven" and "proven by science," Plaintiff used the Products, specifically #3, as directed.  Plaintiff suffered hair loss, hair breakage and poor hair condition.

197.  Plaintiff Julia Leon purchased the Olaplex products between January 2019-September 2022 online through Olaplex.com based on representations regarding the safety, formulation and efficacy of the Products made by Defendants in emails sent to Plaintiff, *see supra*, Background Facts, paras. 40-74. Plaintiff saw/heard and relied on these statements before her first purchase of the Products,

and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #3, #4, #4C, #4P, #5, #6, and #7. Plaintiff suffered hair loss, hair breakage, scalp/facial irritation or rash, scalp/facial rash and poor hair condition.

198. Plaintiff Kristie Letizia purchased the Olaplex products in or around July 2021 – July 2022 in person from Nordstrom and Fringe of Lombard Salon based on representations regarding the safety, formulation and efficacy of the Products made by her independent stylist Dimitra Nardi and by Defendants on the product packaging and in general advertising, see *supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes,

formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #0, #3, #4 and #5. Plaintiff suffered hair breakage, dry/brittle hair, hair loss and developed a cowlick on the back of her head. With regard to statements made by her independent stylist, Dimitra Nardi, 687 Gardenia Ln., Bartlett, IL, Plaintiff was informed by her stylists that Olaplex would keep her hair strong and healthy. On information and belief, Plaintiff's stylist received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

199. Plaintiff Tina Lewis purchased the Olaplex products in or around August/ September of 2022, in person from Sallys Beauty Supply LLC and Ulta Beauty based on representations regarding the safety, formulation and efficacy of the Products made by Defendants on Olaplex.com and and Instagram, more generally online, *see supra*, Background Facts, paras. 42-76, before her first purchase, especially claims that the Products (2) create "healthy, beautiful, shiny, touchable hair," ( (4) "= strong, healthy-looking, more resilient hair," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #3, #4, #5, #7 and #9. Plaintiff suffered hair loss, hair breakage, poor hair condition, hair discoloration, scalp/facial irritation or

rash and scalp/facial rash. With regard to statements made by influencers, Plaintiff watched a reel on Instagram by Monique, who said that using Olaplex helped hair growth. Statements such as these that Plaintiff viewed online prior to purchase is what motivated the Plaintiff to purchase the product. On information and belief, these influencers received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

200. Plaintiff Laura Llewellyn purchased the Olaplex products between February 2021-November 2022 online through Amazon and Ulta based on representations regarding the safety, formulation and efficacy of the Products made by Defendants through her hair salon, on Olaplex.com, in social media, such as Facebook and Instagram, through social media influencer Kylie Jenner, on Facebook and TikTok, and more generally online, *see supra*, Background Facts, paras. 42-76, especially claims that the Products "(1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #4, #4P, #5, #7 and #8 and the stylist had

used #0 in the salon.  Plaintiff suffered hair loss, hair breakage, scabbing on scalp, wirey and dry hair. Plaintiff's salon was Tease It With Taylor salon located at 2200 Edwards Street, Houston, TX 77007. On information and belief, Tease It With Taylor salon and influencer Kylie Jenner received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

201.  Plaintiff Stacey Lobdell purchased the Olaplex products in or around September 2022 in person from Sally Beauty based on representations regarding the safety, formulation and efficacy of the Products made by Defendants online, including through Olaplex.com, and social media, see *supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #0, #2, #3 and #4.  Plaintiff suffered hair loss, extreme hair breakage and dry/brittle hair. With regard to statements made by influencers, Plaintiff watched various influencers that

pop-up on her social media, who stated that Olaplex is a bond builder, giving you healthier, shinier hair, stronger hair, prevents breakage and is for all hair types. On information and belief, these influencers received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

202. Plaintiff Llasmin Lozoya purchased the Olaplex products in or around September 2022 in person from Cosmoprof based on representations regarding the safety, formulation and efficacy of the Products made by Defendants online, including through social media, see *supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #0, #4 and #5. Plaintiff suffered hair loss, hair breakage, stringy hair, scalp irritation and dry hair. With regard to statements made by influencers, Plaintiff watched various influencers that popped-up on her social media between May 2022 – October/November 2022, who stated that Olaplex is for

all hair types, restored damage, creates healthy hair, shiny and strong hair. On information and belief, these influencers received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

203.  Plaintiff Lyana Luciano purchased the Olaplex products in July 2020 online through Sephora based on representations regarding the safety, formulation and efficacy of the Products made by Defendants online, including through Olaplex.com and TikTok, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products (1) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #4 and #5. Plaintiff suffered hair loss, hair breakage, poor hair condition, scalp/facial irritation or rash, scalp/facial rash. With regard to statements made by influencers, Plaintiff watched Zoe Cavey on YouTube in July 2020, who said that using Olaplex would improve give her healthier hair and stop her hair from getting split ends. On information and belief, these influencers received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

204. Plaintiff Kim Marietta purchased the Olaplex products between July 2022–February 2023 online through Sephora based on representations regarding the safety, formulation and efficacy of the Products made by Defendants online, including through Olaplex.com, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #3, #4, #5, and #8.  Plaintiff suffered hair loss, hair breakage, poor hair condition and scalp/facial irritation or rash.

205. Plaintiff Theresa McCormack purchased the Olaplex products between March 2021-November 2022 in person through Sephora and Salon Aqua in Hewlett, New York based on representations regarding the safety, formulation and efficacy of the Products made by Defendants on the product packaging and in general advertising, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products (1) create "healthy, beautiful, shiny, touchable

hair," (2) "= strong, healthy-looking, more resilient hair," and (3) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #4 and #5.  Plaintiff suffered hair loss, bald spots and brittle/thinning hair.

206. Plaintiff Leslie McDonald purchased the Olaplex products between July- September 2022 online through Ulta Beauty based on representations regarding the safety, formulation and efficacy of the Products made by Defendants on Olaplex.com, Ulta.com and Sephora.com, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products, and was especially moved by claims the Products (1) create "healthy, beautiful, shiny, touchable hair," (2) "= strong, healthy-looking, more resilient hair," and (3) provide the "ultimate breakage insurance," Plaintiff used the Products as directed, including the use of #3, #4, #4c, #5, #6 and #7.  Plaintiff suffered hair loss, hair breakage, poor hair condition, scalp/facial irritation or rash and scalp/facial rash.

207. Plaintiff Lisa Mendez purchased the Olaplex products on or around November 2022, from Ulta in Woodhaven MI based on representations regarding the safety, formulation and efficacy of the Products made by Defendants on Olaplex.com and, more generally online, see *supra*, Background Facts, paras. 42-76, before her

first purchase, especially claims that the Products (1) "restore[] damaged and compromised hair," (2)  create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!"  Plaintiff used the Products as directed, including the use of #4, #5, and #6.   Plaintiff suffered damage occurring to the sides of her head, several inches broke off, hair thinning, change of hair texture, hair is now like straw.

208. Plaintiff Jill Mooshagian purchased the Olaplex products between November 2021 – July 2022 in person through Ulta and the Planet Beauty, 950 Camarillo Ctr Dr., Ste. 926, Camarillo, CA 93010 based on representations regarding the safety, formulation and efficacy of the Products made by Defendants online, including through Instagram, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," and (5) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and

[are] safe for all hair!" Plaintiff used the Products as directed, including the use of #4, #5 and #6,  Plaintiff suffered hair loss, bald spots, scalp/facial rash and stinging scalp. With regard to statements made by influencers, Plaintiff watched all Olaplex influencers that came up on Instagram in 2021, who said that using Olaplex would strengthen hair for shiny, healthy, thick hair. On information and belief, these influencers received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

209.  Plaintiff Jennifer Morgan purchased the Olaplex products in or around April 2022 from Cosmo Prof in Grand Blanc, MI based on representations regarding the safety, formulation and efficacy of the Products made by Defendants on its website, in social media, and, more generally online, *see supra*, Background Facts, paras. 42-76, before her first purchase, especially claims that the Products (1) create "healthy, beautiful, shiny, touchable hair," (2) "= strong, healthy-looking, more resilient hair," and (3) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #4, #5, #6 and #7.  Plaintiff suffered hair breakage, hair loss, red burning/irritated scalp, scalp burn for months after her hair continued to fall out, inflammation, yeast/fungus all over scalp for months, depression, and anxiety. Plaintiff continues to suffer from

scalp inflammation, hair loss, and emotional distress.

210. Plaintiff Amanda Murphy purchased the Olaplex products between January 2023 in person at Bombshell Salon & Spa, 800 S. Poseyville Rd., Ste. 3, Midland, MI 48640,  based on representations regarding the safety, formulation and efficacy of the Products made by Defendants online, including through Olaplex.com, TikTok and Instagram, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #3.  Plaintiff suffered hair loss, hair breakage, itching/burning scalp, and scabs (she put chemical burns but I do not know if we want to put that unless there is something in her medical file that states it.). With regard to statements made by influencers, Plaintiff watched all Olaplex influencers that came up on Instagram  and TikTok in the Summer of 2022, who said that using Olaplex would ensure to protect further hair damage, restored hair, less frizzing, and shiny hair . On information and belief, these

influencers received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

211. Plaintiff Jessica Nguyen purchased the Olaplex products between August 2021-September 2021 online through Olaplex.com based on representations regarding the safety, formulation and efficacy of the Products made by Defendants on Olaplex.com and through Instagram influencer @curlfactor, *see supra*, Background Facts, paras. 40-74. Plaintiff saw/heard and relied on these statements before her first purchase of the Products, and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of the complete hair repair system. Plaintiff suffered hair loss, hair breakage, poor hair condition, scalp/facial irritation or rash, bald spots, scalp sores, receding hairline and change in curl pattern. On information and belief, @curlfactor received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential

customers on behalf of Olaplex.

212.  Plaintiff Leslie Orr purchased the Olaplex products between July 2021-February 2022 in person through Just Your Style Salon based on representations regarding the safety, formulation and efficacy of the Products made by Defendants through her stylist and on social media, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products, and, was especially moved by claims the Products (1) create "healthy, beautiful, shiny, touchable hair," and (2) are "scientifically proven" and "proven by science." Plaintiff used the Products as directed, including the use of #4, #5 and #7.  Plaintiff suffered hair loss, hair breakage, poor hair condition, hair discoloration, itchy irritated scalp, scalp/facial rash, burning scalp and scalp/facial irritation or rash. In addition to the injuries from using the product, Plaintiff has suffered a lack of self-esteem and depression. Plaintiff's stylist is Tibi Brimhall of Just Your Style Salon, located at 658 N. 800 E, Spanish Fork, UT 84660. On information and belief, Plaintiff's stylist and Just Your Style Salon received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

213.  Plaintiff Heather Passmore purchased the Olaplex products on or about March 29, 2022, at Cosmoprof in Vernon BC based on representations regarding the safety, formulation and efficacy of the Products made by Defendants through her hair

stylist Jessica at Chatters Hair Salon located at 4900 27 St. #530 Vernon BC V1T 7G7, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products. Plaintiff used the Products as directed, including the use of #3, #8 and #9.  Plaintiff suffered hair loss, hair thinning, hair breakage, split ends, anxiety, and depression.

214.  Plaintiff Sylva Pate purchased the Olaplex products in September 2022 in person through Sephora and Ulta based on representations regarding the safety, formulation and efficacy of the Products made by Defendants on the Sephora, Olaplex, and Ulta website and on social media (although she cannot recall the specific influencers), *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard these statements before her first purchase of the products, and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2)  create "healthy, beautiful, shiny, touchable hair," (3) "= strong, healthy-looking, more resilient hair," and (4) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #4, #4C, #5 and #8.  Plaintiff suffered hair loss, scalp/facial irritation or rash, poor hair condition hair breakage, hair discoloration and extreme scalp burning and pain. On information and belief, the influencers on which Plaintiff relied received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims

made therein in marketing the Products to potential customers on behalf of Olaplex.

215.  Plaintiff Sara Petty purchased the Olaplex products between 2018 and November 2022 online through Olaplex.com and Sephora based on representations regarding the safety, formulation and efficacy of the Products made by Defendants through Sephora, packaging of the Products, and influencers, including Kim Kardashian on social media in or around March 2019, *see supra*, Background Facts, paras. 42-76. Plaintiff saw/heard and relied on these statements before her first purchase of the Products, especially claims the Products (1) "restore[] damaged and compromised hair," (2)  create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #0, #3, #4, #5, and #6.  Plaintiff suffered hair loss, scalp itching, painful blisters/sores that scabbed over on scalp and hairline, hair breakage, changes in hair texture from soft and wavy, with natural waves to lifeless, straight, straw like and frizzy texture without all my usual hair properties.

216. Plaintiff  Danielle  Phelps  purchased  the  Olaplex  products between November 2019 – January 2022 online through Amazon.com, Sephora, Olaplex.com, based on representations regarding the safety, formulation and efficacy

88

of the Products made by Defendants through Olaplex-affiliated hair stylist, Kat and members of the Leon's Beauty School, and online, including through Olaplex.com, Facebook, TikTok and Instagram, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements after her first purchase of the Products and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #0, #3, #4, #4P, #5, #7 and #8.  Plaintiff suffered hair breakage, bald spots, dry scalp, dandruff and scalp/facial irritation. With regard to statements made by influencers, Plaintiff watched Teshawna on Instagram in 2020, who said that using Olaplex would give you healthy, shiny, hair, not dull and the purple shampoo would tone down the yellow. On information and belief, these influencers received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

217. Plaintiff Erica Pilicy-Ryan purchased the Olaplex products between 2020 – January 2023 online through Amazon.com and Olaplex.com and in

person through Nordstrom based on representations regarding the safety, formulation and efficacy of the Products made by Defendants online, including through Olaplex.com, Facebook, TikTok and Instagram, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements after her first purchase of the Products and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #4, #5, #7 and the Repair Treatment Kit. Plaintiff suffered hair loss, hair shedding, scalp pain and emotional pain and suffering related to injuries. With regard to statements made by influencers, Plaintiff saw various Olaplex online ads with celebrities Drew Barrymore, the Kardashians and Kristen Cavallari and watched Motherchic on Instagram in 2020, who said that Olaplex was a "high end" and "luxurious" product that would make your hair strong and beautiful. On information and belief, the influencer on whom Plaintiff relied received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex. On information

and belief, Olaplex failed to obtain express authority from the celebrities on whom Plaintiff relied to claim they endorse(s) the Products and/or failed to regularly confirm with them that their endorsement remained unchanged.

218.  Plaintiff Robin Poston purchased the Olaplex products between January 2022 – November 2022 online through Olaplex.com, Sephora and Khols based on representations regarding the safety, formulation and efficacy of the Products made by Defendants online, including through Olaplex.com, Facebook, TikTok and Instagram, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #0, #3, #4, #5, #6, and #7, The Bond Treatment System, Home and Aay Daily Ritual Kit, Frizz Control Styling Duo and Hair Repair Treatment Set.  Plaintiff suffered hair loss, hair breakage, rash on the back of neck, depression and anxiety. With regard to statements made by influencers, Plaintiff watched mikaylanogueira, ledafazal, thebeautyboutique on social media between April 2021

-February 2022, who said that using Olaplex would give you flawless color without the damage, it's magic, Amazing- took black to blonde in 1 session. Plaintiff also read an article in Marie Claire in July 2021 about Kim Kardashian's hair care secrets which included Olaplex. On information and belief, these influencers received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

219.  Plaintiff Nicole Quenga purchased the Olaplex products between May-August 2022 in person through Ulta based on representations regarding the safety, formulation and efficacy of the Products made by Defendants on the Olaplex.com website, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products, and, was especially moved by claims the Products do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #3, #4 and #5.  Plaintiff suffered hair loss, hair breakage, poor hair condition, irritated/sore/burning scalp and scalp/facial irritation or rash.

220. Plaintiff Melinda Quinn purchased the Olaplex products between January 2022- March 2022 in person at a hair salon in Bonaire in the Caribbean and online through Amazon.com based on representations regarding the

safety, formulation and efficacy of the Products made by Defendants through her stylist, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the products and was especially moved by claims the Products "= strong, healthy-looking, more resilient hair" and would make her curly hair less frizzy and more manageable. Plaintiff used the Products as directed, including the use of #0, #3 and #6.  Plaintiff suffered hair loss, hair breakage, poor hair condition, scalp irritation, itchy scalp and burning scalp. Plaintiff's stylist was Barbel of Be Youty Salon, located at Kaya Papa Cornes 37, Kralendijk, Bonaire. On information and belief, Plaintiff's stylist received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

221.  Plaintiff Charity Reddish purchased the Olaplex products on or about September 22, 2022, online from Amazon based on representations regarding the formulation and efficacy of the Products made by Defendant on the product packaging, *see supra*, Background Facts, paras. 113-147, before her first purchase, especially claims that the product would repair her hair and make it stronger.  Plaintiff also heard about the Products from her stylist prior to purchase. Plaintiff used the Products as directed, including the use of #0, #3, #4, #5, #6, #7 and #8.  Plaintiff suffered from hair thinning, hair breakage, itchy scalp, scabbing on scalp, and hair

texture changes that caused her hair to become dry and brittle.

222.  Plaintiff Natalie Register purchased the Olaplex products in June 2022 in person through Sephora based on representations regarding the safety, formulation and efficacy of the Products made by Defendants on the Sephora website and packaging of the Products, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" and "repairs and strengthens all hair types." Plaintiff used the Products as directed, including the use of #3.  Plaintiff suffered extreme hair loss, loss of eyebrows and eyelashes, overall balding, hair breakage, painful sore like bumps on the scalp, hair texture, chronic headaches, severe scalp itching, severe scalp pain, loss of pigmentation, depression and loss of menstrual cycle for 3 months.

223. Plaintiff Jean Riccio purchased the Olaplex products October 2021 online through Amazon.com based on representations regarding the safety, formulation and efficacy of the Products made by Defendants online, including through Olaplex.com, Facebook, TikTok and Instagram, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products (1)

create "healthy, beautiful, shiny, touchable hair," (2) "= strong, healthy-looking, more resilient hair," (3) provide the "ultimate breakage insurance," and (4) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #3, #4, #5, #6, #7 and #8. Plaintiff suffered hair loss, hair breakage, bald spots and change in hair texture. With regard to statements made by influencers, Plaintiff watched various influencers that would pop-up on social media between August - October 2021, who said that using Olaplex builds bonds, strengthens hair and makes hair smooth. On information and belief, these influencers received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

224. Plaintiff Sarah Richardson purchased the Olaplex products in February 2022 in person through Ulta Beauty based on representations regarding the safety, formulation and efficacy of the Products made by Defendants on its Tik Tok account, through influencers on Instagram and Tik Tok (although she cannot recall names) and the Ulta website, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products "restore[] damaged and compromised hair," and provide the "ultimate breakage insurance." Plaintiff used

the Products as directed, including the use of #4, #5 and #6.  Plaintiff suffered hair loss, hair breakage and poor hair condition. On information and belief, the influencers Plaintiff saw and relied on received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex. On information and belief, Ulta received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

225.  Plaintiff Heather Rife purchased the Olaplex products in or around  2020 online and in person from Ulta,  Sephora and Salon Centric in Fort Myers, Florida, based on representations regarding the safety, formulation and efficacy of the Products made by Defendants online, including through social media, see *supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including

the use of #3, #4, #4P, #5, #6 and #7. Plaintiff suffered hair loss and hair breakage. With regard to statements made by influencers, Plaintiff watched various influencers that popped-up on her social media in 2020, who stated that Olaplex was good for your hair and would repair damaged hair. On information and belief, the stylist and influencers on whom Plaintiff relied received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex. On information and belief, Sephora, Ulta and Salon Centric received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

226. Plaintiff Alexa Roemer purchased the Olaplex products in or around November 2022 online through Sephora.com based on representations regarding the safety, formulation and efficacy of the Products made by Defendants online, including through Olaplex.com, Facebook, TikTok and Instagram, see supra, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products (1) create "healthy, beautiful, shiny, touchable hair," (2) "= strong, healthy-looking, more resilient hair," (3) provide the "ultimate breakage insurance," and (4) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used

the Products as directed, including the use of #0, #3, #4, #5 and #8. Plaintiff suffered Cyst like bumps across her scalp, headache and pain at the crown and temples, hair loss, anxiety, increased depression and lowered self-worth. With regard to statements made by influencers, Plaintiff watched celebrities Kim Kardashian, Christina Applegate, Jennifer Lopez, and various Olaplex social media accounts between November 2022, who said that using Olaplex would help with any damage caused by lightening your hair, which I had done 2-3 months prior. They said it was the only way they were able to continue bleaching their hair and have it remain completely healthy. They said it was part of their "routine". They said it was scientifically proven and free from chemicals that would harm me, so I figured why not On information and belief, these influencers received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex. On information and belief, Sephora and Ulta received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

227. Plaintiff Felicia Sanchez purchased the Olaplex products between August 2022 – February 2022 in person from Ulta and Remedy Hair Shoppe based on representations regarding the safety, formulation and efficacy of the Products made by Defendants on the product packaging and in general advertising, *see supra*,

Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #4, #5, #7 and #8.  Plaintiff suffered hair loss, hair breakage, baldness, sore scalp, scalp/facial irritation and/or rash. With regard to statements made by influencers, Plaintiff watched Kim Kardashian in 2018, who said that using Olaplex was her go to for hair care and that is what motivated the Plaintiff to purchase the product. On information and belief, Kardashian received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

228. Plaintiff Amy Shay purchased the Olaplex products between March 2021-September 2022 in person through Sephora and Ulta based on representations regarding the safety, formulation and efficacy of the Products made by Defendants on Olaplex.com, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products before her

first purchase of the Products, and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #0, #3, #4, #4P, #5, #6, #7, #8 and #9.  Plaintiff suffered poor hair condition hair breakage and hair texture. On information and belief, Sephora and Ulta received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

229.  Plaintiff Farzana Siddiquei purchased the Olaplex products in  October 2022 online through Olaplex.com based on representations regarding the safety, formulation and efficacy of the Products made by Defendants online, including through Olaplex.com, and Instagram, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-

looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of the Style and Strengthen Hair Set and Hair Repair Treatment Kit.  Plaintiff suffered hair loss, hair breakage, poor hair condition, scalp/facial irritation or rash and thin/frizzy hair. With regard to statements made by influencers, Plaintiff watched various influencers and the Olaplex Instagram page in September/October 2022, who promised hair repair, bond builder, healthier, shinier hair, deeper repair and stronger hair. On information and belief, these influencers received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

230. Plaintiff Danielle Sigmon purchased the Olaplex products between October 4, 2022, through December 12, 2022, from The Beauty Designer Hair Salon based on representations regarding the safety, formulation and efficacy of the Products made her stylist, Melissa Campbell and Defendants on Olaplex.com and, more generally online, see *supra*, Background Facts, paras. 42-76, before her first purchase, especially claims that the Products (2) create "healthy, beautiful, shiny, touchable hair," (4) "= strong, healthy-looking, more resilient hair,." Plaintiff used the Products as directed, including the use of #3, #4, #5, and #6.   Plaintiff suffered

hair thinning, 50 percent of her hair fell out, hair broke off, frizzing, straw like texture, itchy scalp, sore scalp, embarrassment, wanting to stay home, covering in hats and wigs, emotional distress, depression, possibly loss of income. On information and belief, Melissa Campbell and The Beauty Designer Hair Salon received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

231.   Plaintiff Rhiannon Singer purchased the Olaplex products between July 2019 – December 2022 online through their hair independent stylist Brian Boyak in Munsing, Michigan, based on representations regarding the safety, formulation and efficacy of the Products made by Defendants online, including through Olaplex.com, Facebook, TikTok and Instagram, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements after her first purchase of the Products and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #3, #4, #4P, #5, #6, #7 and the 4

in 1 Moisture mask.  Plaintiff suffered hair loss, hair breakage, poor hair condition, scalp/facial irritation , bumps on scalp, Bald spots, red irritated burn spots on scalp, anxiety, depression, itchy scalp and self-esteem issues. With regard to statements made by influencers, Plaintiff watched Kim Kardashian and Paris Hilton in 2020, who said that using Olaplex made their hair feel healthy. On information and belief, these influencers received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

232. Plaintiff Jodi Sobiech purchased the Olaplex products between June 2019-June 2022 online through Olaplex.com, Sephora and Ulta and in person from Ulta and House of Gold Salon in Randolph, New Jersey,  based on representations regarding the safety, formulation and efficacy of the Products made by Defendants online, including through Olaplex.com, Facebook, TikTok and Instagram, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements after her first purchase of the Products and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten,

parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #0, #3, #4, #4P, #5, #6, #7, #8 and #9.  Plaintiff suffered hair loss, hair breakage, depression, and withdrew socially. With regard to statements made by influencers, Plaintiff watched various influencers that would pop-up on social media during Oaplex. Plaintiff's former stylist, Rochelle, House of Gold Salon, 1250 Sussex Turnpike, Randolph, NJ 07869,  had an Olaplex sticker on her salon door and promo type material on her salon displays along with products to purchase and take home. The stylist said it "helps the hair, especially when coloring." "It strengthens, protects. It is good/safe to use weekly, and can even leave in overnight." "It is a really amazing product for you to invest in for your hair to keep it beautiful." On information and belief, this stylist received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

233. Plaintiff Maria Sokolova purchased the Olaplex products between January 2022 through July 2022, from Primor based on representations regarding the safety, formulation and efficacy of the Products made her stylist and Defendants on Olaplex.com and, more generally online, see *supra*, Background Facts, paras. 42-76, before her first purchase, especially claims that the Products (1) "restore[] damaged and compromised hair," (2)  create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more

resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!"   Plaintiff used the Products as directed, including the use of #1, #2, #3 and #6.   Plaintiff suffered large bald spots to the scalp, heavily damaged hair, loss of color, hair loss, hair breakage, dry scalp, itchiness, and emotional distress. With regard to statements made by influencers, Plaintiff watched various influencers on the Olaplex Instagram page, who promised hair repair, bond builder, healthier, shinier hair, deeper repair and stronger hair.  On information and belief, these influencers received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

234. Plaintiff Debra Sterlacci purchased the Olaplex products between September 2021-Summer 2022 in person through Cosmoprof based on representations regarding the safety, formulation and efficacy of the Products made by Defendants on Olaplex.com, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products, and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) "= strong, healthy-looking, more resilient hair," and (3) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates,

dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #0, #3, #4, #5, #6, #7, #8 and the 4 in 1 moisture mask. Plaintiff suffered hair loss, hair breakage and poor hair condition. On information and belief, Cosmoprof received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

235. Plaintiff Noel Talerico purchased the Olaplex products between May 2022 – September 2022 online through Olaplex.com and in person from Ulta, based on representations regarding the safety, formulation and efficacy of the Products made by Defendants online, including through Olaplex.com, Facebook, TikTok and Instagram, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #4, #4P, #5 and #8. Plaintiff suffered hair loss, hair breakage, poor hair condition, hair discoloration and scalp/facial irritation or rash. With regard

to statements made by influencers, Plaintiff watched Kim Kardashian on social media May 2022, who said that she swore by the product. Plaintiff thought that if Kim Kardashian's hair stylist was telling her to use it that it must be good. On information and belief, Kardashian's stylist received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex. On information and belief, Ulta received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

236. Plaintiff Miecha Isys Thomas purchased the Olaplex products between March and May 2021 in person through Sephora based on representations regarding the safety, formulation and efficacy of the Products made by Defendants on Olaplex.com and Sephora in-store advertisements, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products, especially claims the Products do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of shampoo #4, conditioner #5, #0 and #3. Plaintiff suffered hair loss, hair breakage, poor hair condition, scalp/facial irritation or rash, scalp/facial rash, burns to scalp, and changes in her hair texture and

curl pattern. On information and belief, Sephora received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

237. Plaintiff Vanessa Tocco purchased the Olaplex products between October – December 2022 in person from Ulta based on representations regarding the safety, formulation and efficacy of the Products made by Defendants on the product packaging and in general advertising, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use #4, #5 and #6.  Plaintiff suffered hair loss, hair breakage, poor hair condition, hair discoloration, scalp/facial irritation or rash and itchy scalp. Using Olaplex was recommended to Plaintiff by her stylist, Stephanie, who works at AustinBach Hair Studio, located at 6020 N Federal Hwy, Unit 2, Boca Raton, FL 33487. On information and belief, Plaintiff's stylist received marketing materials from Olaplex with directions from

Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

238. Plaintiff Marina Tolic purchased the Olaplex products in or around 2017, from her stylists, and online from Adore Beauty website based on representations regarding the safety, formulation and efficacy of the Products made by Defendant on Olaplex.com, through her stylists, Ebony Harrison of Ebony Hair 4 Jedburgh Street Kenmore and Lujo Hair and Makeup 53 Vernon Terrace Teneriffe, and, more generally online, *see supra*, Background Facts, paras. 42-76, before her first purchase, especially claims that the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #1, #2, #3 #4, and #5. Plaintiff suffered loss of hair density, (over half of the volume), hair breakage, hair breakage halfway down the hair shaft, see through ends, and a scalp that smelled like mold. With regard to statements made by influencers, Plaintiff's stylist, Ebony Harrison of Ebony Hair, said approximately three (3) times in 2017 that the Products were "state of the art and scientifically proven to prevent breakage from going lighter, and that people were

able to achieve amazing results and lighten quicker because of the protection Olaplex provided." These statements by her stylist, as well as the statements by influencers on social media who endorsed the product, are what motivated the Plaintiff to purchase the product. On information and belief, these influencers received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

239.  Plaintiff Leslie Tolstoy purchased the Olaplex products in October 2022 in person through Phagans School of Hair Design, 12000 SE 82nd Ave #4010, Happy Valley, OR 97086, based on representations regarding the safety, formulation and efficacy of the Products made by Defendants through an Olaplex-affiliated hair stylist, Alana Ice and members of the Phagans School salon, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the products, and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2)  create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," and (5) provide the "ultimate breakage insurance." Plaintiff used the Products as directed, including the use of #0, #3, #4 and #5.  Plaintiff suffered hair loss, hair breakage, dry brittle hair, balding patches, scalp irritation and trouble thinking/concentrating. On information and

belief, Ice and Phagans School received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

240. Plaintiff Alexandra Urresti purchased the Olaplex products between March 2022-November 2022 online through Cosmoprof based on representations regarding the safety, formulation and efficacy of the Products made by Defendants through retailers Sephora and Ulta *see supra*, Background Facts, paras. 113-147, especially claims the Products (1) create "healthy, beautiful, shiny, touchable hair," (2) "= strong, healthy-looking, more resilient hair," and (3) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #4, #5, #6 and #7. Plaintiff suffered hair loss, scalp/facial irritation or rash, poor hair condition hair breakage and scalp/facial rash. On information and belief, Sephora and Ulta received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

241. Plaintiff Rebekah Valentine purchased the Olaplex products in July 2022 online through Sephora based on representations regarding the safety, formulation and efficacy of the Products made by Defendants through her stylist at

Salon Nuuvo, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements prior to her first purchase of the Products and was especially moved by claims the Products provide the "ultimate breakage insurance," will prevent breakage if added to bleach, and "do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #0, #3, #4, #5 and #6.  Plaintiff suffered hair loss, poor hair condition, hair breakage, change in hair texture and hair discoloration. Plaintiff's stylist is Raychel Harrison, who owns Salon Nuuvo, located at 26777 Agoura Rd. b3, Calabasas, CA 91302. On information and belief, Plaintiff's stylist received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

242. Plaintiff Tanya Vallejo purchased the Olaplex products between January 2021 – June 2021 through Fantastic Sams based on representations regarding the safety, formulation and efficacy of the Products made by Defendants online, including through, Facebook, TikTok and Instagram, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) are "scientifically proven" and

"proven by science," and (3) "= strong, healthy-looking, more resilient hair."
Plaintiff used the Products as directed, including the use of #1, #2L, and #3. Plaintiff
suffered hair loss, bald spots and itchy scalp. With regard to statements made by
influencers, Plaintiff watched various influencers beginning in 2019 that would pop-
up on Instagram, and TikTok, who said that Olaplex was scientifically proven to
repair and bond your hair and that it would solve hair breakage. On information and
belief, these influencers received marketing materials from Olaplex with directions
from Olaplex to use in these materials and the claims made therein in marketing the
Products to potential customers on behalf of Olaplex.

243. Plaintiff Jerrika Vega purchased the Olaplex products between May
2021- January 2023 online and in person at Cosmoprof, based on representations
regarding the safety, formulation and efficacy of the Products made by Defendants
online, including through Olaplex.com, *see supra*, Background Facts, paras. 113-147.
Plaintiff saw/heard and relied on these statements before her first purchase of the
Products and was especially moved by claims the Products (1) "restore[] damaged
and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair,"
(3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-
looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6)
do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates,
dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff

used the Products as directed, including the use of #0, #3, #4, #5, #6, #7, #8 and #9.  Plaintiff suffered dry/brittle hair, flaky scalp, itchy scalp, blisters and hurtful skin tag.

244.  Plaintiff Christina Ventor purchased the Olaplex products on or around April 11, 2021, and October 15, 2022, from Cosmoprof in Huntington Beach California based on representations regarding the safety, formulation and efficacy of the Products made Defendants on Olaplex.com and, more generally online, see *supra*, Background Facts, paras. 42-76, before her first purchase, especially claims that the Products (1) "restore[] damaged and compromised hair," (2)  create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #0, #3, #4, #4C #5, #6, #7,and #8  Plaintiff suffered – hair breakage, hair loss, loss of hair density, depression, frizzy hair, change of hair texture, expense and loss of time.

245. Plaintiff Robin Vogt purchased the Olaplex products Between 2019-2022 from Sephora, Ulta, and Prime Cut Salon based on representations regarding the safety, formulation and efficacy of the Products made by Defendants through

Price Cuts located in Lindenhurst, NY before her first purchase, *see supra*, Background Facts, paras. 113-147. Plaintiff used the Products as directed, including the use of #0, #4, #4P, #5, #6 and #7.  Plaintiff suffered bald spots.

246.  Plaintiff Terri Witts purchased the Olaplex products between January 2022 – March 2022 online through Amazon.com based on representations regarding the safety, formulation and efficacy of the Products made by Defendants online, including through Olaplex.com, Facebook, TikTok and Instagram, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchase of the Products and was especially moved by claims the Products (1) "restore[] damaged and compromised hair," (2) create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) provide the "ultimate breakage insurance," and (5) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, dea, aldehydes, formaldehyde, gluten, parabens and [are] safe for all hair!" Plaintiff used the Products as directed, including the use of #0, #3, #4 and #5.  Plaintiff suffered hair loss, red/burning/painful scalp, hair breakage and brisk/ugly/unsoft hair. With regard to statements made by influencers, Plaintiff watched influencers that would pop-up on Facebook in late 2021 – March 2022, who said that using Olaplex made their hair shine and healthy, with no harsh products, hair is silky, uses new technology. On information and belief, these influencers received marketing materials from Olaplex

with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

247.  Plaintiff Robin Yeager purchased the Olaplex products in October 2020 and then again April 2022 online through Cosmoprof based on representations regarding the safety, formulation and efficacy of the Products made by Defendants by Plaintiff's stylist, Faye Stasiak at Shear Desire, *see supra*, Background Facts, paras. 113-147. Plaintiff saw/heard and relied on these statements before her first purchased of the Products and was especially moved y claims the Products (1) create healthy, beautiful, shiny, touchable hair, (2) protect the integrity of blonde hair that is chemically treated, and (3) "= strong, healthy-looking, more resilient hair." Plaintiff used the Products as directed, including the use of #3, #4 and #5.  Plaintiff suffered hair loss, hair breakage and poor hair condition. Shear Desire is located at 6170 Pearl Rd., Parma Heights, OH 44130. On information and belief, Plaintiff's stylist received marketing materials from Olaplex with directions from Olaplex to use in these materials and the claims made therein in marketing the Products to potential customers on behalf of Olaplex.

248. Plaintiff Maureen Zavatone purchased the Olaplex products between Spring 2022-December 2022 in person from CVS based on representations regarding the safety, formulation and efficacy of the Products made by Defendants on the product packaging and in general advertising, *see supra*, Background Facts,

paras. 113-147. Plaintiff relied on these statements prior to her first purchase of the Products and was especially moved by claims the Products create "healthy, beautiful, shiny, touchable hair." Plaintiff used the Products as directed, including the use of #0, #7 and #8 Moisture Mask. Plaintiff suffered hair loss, hair breakage and poor hair condition.

## AGENCY AND PRIVITY OF THIRD PARTIES

231.   To the extent third parties made the false and misleading statements to Plaintiffs on which they relied (see *infra*, Plaintiff-Specific Allegations), the third parties were agents of Olaplex and made the representations on Olaplex's behalf with the consent of Olaplex and the third party using information and promotional materials provided by Olaplex to the third party for the purpose of promoting the Products and otherwise subject to Olaplex's control. Olaplex expressly directed these third-party agents to make the false and misleading statements or, by virtue of Olaplex's promotion of these third parties on its website and in other advertisements and its training of these agents, the agents and Plaintiffs reasonably believed the agents were authorized to make these statements in their promotion of the Products to Plaintiffs. Furthermore, the agents made the false and misleading statements and/or sold the Products to Plaintiffs pursuant to an agreement with Olaplex to promote and/or sell the Products. Therefore, Plaintiffs are in contractual privity with Olaplex even if they relied on statements made by or purchased Products from Olaplex's

agents.

# FIRST CAUSE OF ACTION

## Breach of Express Warranty

## Against Olaplex

232.   Plaintiffs hereby incorporate and restates the above allegations by reference as though fully set forth herein.

233.   Plaintiffs formed a contract with Olaplex at the time they purchased the Products. The terms of that contract include the promises and affirmations of fact made by Olaplex through marketing and advertising as part of the Campaign. This marketing and advertising constitute express warranties and became part of the basis of the bargain, and are part of the standardized contract between Plaintiffs and Defendant.

234.   By way of its Campaign, Olaplex promoted the Products to Plaintiffs using multiple false and/or misleading express promises, including, but not limited to claims the Products: (1) "restore[] damaged and compromised hair," (2)  create "healthy, beautiful, shiny, touchable hair," (3) are "scientifically proven" and "proven by science," (4) "= strong, healthy-looking, more resilient hair," (5) provide the "ultimate breakage insurance," and (6) do not contain harsh or harmful chemicals, such as "silicone, sulfates, phthalates, DEA, aldehydes, formaldehyde, gluten,

parabens and [are] safe for all hair!"[21]

235.   For the reasons previously detailed at length, each statement is false and/or misleading. The Products are not safe, do not gentle, free of harsh chemicals, a better alternative to traditional shampoos and extensively tested. To the contrary, the Products contain or contained at all relevant times, among other harsh ingredients, sulfates, silicones, benzene or ingredients which combine to become benzene, lilial and other known allergens, sensitizers and skin irritants. These ingredients are known to cause ACD and trigger other immune reactions due to their status as allergens or sensitizers, to which a large and growing proportion of the population are allergic. As the same time, the Products—what Olaplex sells as a system to repair dry and damaged hair—contain inadequate cleansing ingredients to remove the non-water-soluble components found in the Products as well as dirt, dust, dead skin and other debris commonly found on the scalp and hair. This leads to the buildup and disruption of the hair's natural lubrication system. Build up and lack of natural moisturizers lead to dryness, breakage and brittleness and SD. The symptoms of these conditions are hair loss and other personal injuries, such as itching, blisters and sores, redness, rashes, yeast and bacterial infections of the scalp, among other things. Over time, these conditions cause permanent damage to the scalp and hair follicles and hair. In

---

[21]   https://olaplex.com/pages/how-it-works;   https://youtu.be/fEboj5Rdczg?t=107; and https://olaplex.com/pages/frequently-asked-questions.

addition, the Products contain ingredients which

236.   Despite its representations to the contrary, Olaplex did not test these Products extensively or adequately prior to selling them. On information and belief, any HRIPT failed to meet scientific standards in terms of the concentration of the Products used on test subjects. On information and belief, any toxicology testing was limited to review of literature and failed to properly address or evaluate gaps in data for certain ingredients or how certain components of the Products would react when put together in a formula.

237.   All conditions precedent to Olaplex's liability under this contract were performed by Plaintiffs when they purchased and used the Products.

238.   Olaplex breached express warranties about the Products and their qualities because their statements about the Products were false and the Products do not conform to their affirmations and promises. Plaintiffs relied on Defendants' false and misleading claims about the Products including, but not limited to, the claims made by Defendants on social media sites, in purchasing the Products. Plaintiffs would not have purchased the Products had they known the true nature of the Products and the misstatements regarding what the Products are, what they contain and how they would work.

239.   In December 2022, Plaintiffs informed Olaplex in writing of these breaches and provided Defendant an opportunity to address them.  Olaplex has failed

to do so.

240.   As a proximate result of Olaplex's breach of warranty, Plaintiffs have been personally injured and suffered other damages.

## SECOND CAUSE OF ACTION

### Breach of Implied Warranty

### All Plaintiffs Against Olaplex and Cosway

241.   Plaintiffs hereby incorporate and restate the above allegations by reference as though fully set forth herein.

242.   At all times relevant hereto, there was a duty imposed by law on Defendants which requires that a manufacturer or seller's product be reasonably fit for the purposes for which such products are used, and that product be acceptable in trade for the product description.

243.   Notwithstanding Defendants' aforementioned duty, at the time of delivery, the Products sold to Plaintiffs were not merchantable because they contain harmful ingredients and other defect(s) that cause hair loss and other injuries upon proper application and do not contain sufficient cleanser or otherwise perform as represented.

244.   In December 2022, Plaintiffs notified Defendants that the Products were not merchantable. This notice was within a reasonable time after the defect manifested to Plaintiffs and other consumers or within a reasonable time after

Plaintiffs discovered facts sufficient to determine or suspect the Products, which Defendants tout as safe, made of only gentle, non-harmful ingredients and scientifically formulated and proven, were the cause of their injuries.

245. As a proximate result of the non-merchantability of the Products, Plaintiffs and other consumers sustained personal injury and other damages.

## <u>THIRD CAUSE OF ACTION</u>

**Violation of California False Advertising Law ("CFAL")
Bus. & Prof. Code § 17500 et seq and
California Unfair Competition Statute ("CUCS"))
Cal. Bus. & Prof. Code § 17200 et seq.**

### All Plaintiffs Against Olaplex and Cosway

246. Plaintiffs hereby incorporate and restate the above allegations by reference as though fully set forth herein.

247. Plaintiffs, as purchasers of the Products, are consumers within the meaning of CFAL and CUCS given that Defendants' business activities involve trade or commerce, are addressed to the market generally and otherwise implicate consumer protection concerns.

248. Defendants engaged in unconscionable commercial practices, deception and fraud in the Campaign, and specifically when marketing the Products to Plaintiffs by, among other things, failure to disclose that it paid or otherwise incentivized influencers, brand ambassadors, hair models, celebrities, magazines and other advertising media, stylists, salon owners and retailers to promote the Products using

content controlled by Defendant in violation of FTC regulation and guidance. In so doing, Defendant affirmatively misrepresented these third parties endorsed the Products without the influence of financial or other gain and, with regard to all but retailers, regularly used the Products as recommended by Defendants, that is to say, to the exclusion of other competitive products or, at the least, traditional shampoos. In addition, with regard to influencers, brand ambassadors and celebrities, Defendant affirmatively mispresented that these parties could achieve their hair styles without the use of professional hair stylists. Finally, Defendant also suggested celebrities regularly used the Products and/or endorsed or sponsored or were affiliated with the Products or Defendant when, in fact, none of those things were true.

249.   Defendant intentionally obscured the commercial nature of the representations made by these agents with the intent that consumers, including Plaintiffs, would perceive that advertising as excited peer-to-peer testimonials arising strictly from customer satisfaction, not paid promotions. Defendant understood that this deception would and did have the effect of making the representations much more effective in selling the Products.

250.   The FTC is charged with protecting consumers from false and deceptive advertising. CUCL is modelled on the Federal Trade Commission Act ("FTCA") and courts look to judicial interpretation of the FTCA in interpreting CUCS. *See Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 506, 129 Cal. Rptr. 2d 486, 493

(2003) ("Because of this relationship between the [UCL] and the Federal Trade Commission Act, judicial interpretations of the federal act have persuasive force."). Violation of CFAL constitutes an unlawful act for purposes of CUCS. *Roper v. Big Heart Pet Brands, Inc.*, 510 F. Supp. 3d 903, 922 (E.D. Cal. 2020).

251.  The FTCA requires prominent, clear and conspicuous disclosure "[w]hen there exists a connection between the endorser and the seller of the advertised product that might materially affect the weight or credibility of the endorsement." *Id.* (citing 16 C.F.R. § 255.5). Defendants' failure to comply with the FTCA rendered its use of influencer, brand ambassador and similar endorsement-based advertisement misleading and a violation of both CFAL and CUCS.

252.  Beyond its duty to communicate honestly with consumers about the quality and nature of the Products, once Defendants learned of defects in the Products, including their tendency to cause hair loss and other injuries despite proper use (or based upon foreseeable misuse), Defendants owed consumers, including Plaintiffs, a duty to disclose the risks of hair loss and other injuries because those risks would be a material fact in a consumer's decision-making process, and, without Defendants' disclosure, consumers would not know that such a risk exists, particularly given Defendants' representations that the Products are safe, free from harsh or harmful chemicals, repair dry and damaged hair and are scientifically

formulated and proven.

253.   Defendant intended that Plaintiffs and other reasonable consumers would rely on—and Plaintiffs, in fact, reasonably and justifiably relied on—Defendants' misrepresentations as to the nature, safety and efficacy including, but not limited to, the claims made by Defendants on social media sites, in purchasing the Products.

254.   Defendants' conduct constitutes false advertising within the meaning of CFAL. Defendants' material non-disclosure constitutes deception, fraud, false promise, misrepresentation and/or omission of material facts as to the nature of the goods in violation of CFAL.

255.   Defendants' conduct also constitutes an unconscionable commercial practice, deception, fraud, false promise, misrepresentation and/or omission of material facts as to the nature of the Products in violation of the CUCS.

256.   Defendants are the producing and proximate cause of Plaintiffs' injuries.

## FOURTH CAUSE OF ACTION

### Negligence and/or Gross Negligence

### All Plaintiffs Against Olaplex and Cosway

257.   Plaintiffs hereby incorporate and restate the above allegations by reference as though fully set forth herein.

258.   Defendants owed Plaintiffs a duty to use due care in the development, testing, planning, design, marketing and sale of the Products offered for use by consumers.

259.   Through its failures to exercise due care, Defendants breached this duty by producing, processing, manufacturing, distributing and/or offering for sale the Products in a defective condition that was unsafe for use at home by consumers.

260.   Defendants breached this duty of care to Plaintiffs by intentionally failing to follow industry standards that prohibit the use of chemicals that are allergens, sensitizers and/or irritants, are carcinogenic, or for which there is inadequate data to determine their safety for use in products used for long or indefinite periods of time on the skin. In addition, Defendants breached this duty of care to Plaintiffs by intentionally failing to perform research or testing consistent with applicable industry and scientific standards before placing the Products on the market. Further, Defendants breached this duty of care to Plaintiffs by intentionally employing false, misleading and unconscionable advertising and advertising practices.

261.   Defendants further intentionally breached this duty of due care by failing to properly and adequately inform consumers once safety concerns, including hair loss and other injuries, were brought to the Defendants' attention, and further breached this duty of care by failing to fully and appropriately discontinue the sale of

and recall the Products.

262.   Defendants knew, or in the exercise of reasonable care should have known, that the Products present an unacceptable risk to consumers, and would result in damages that were foreseeable and reasonably avoidable.

263.   In each instance where Defendants' conduct fell below the applicable standard of care, Defendants' conduct was intentional and undertaken with knowledge that Defendants' acts or omissions were reckless and likely to lead to serious and long lasting injury to consumers.

264.   As a direct and proximate result of Defendants' above-referenced negligence and gross negligence, Plaintiffs have suffered and are entitled to recover damages, both compensatory and punitive.

## FIFTH CAUSE OF ACTION

### Product Liability and Strict Product Liability

### All Plaintiffs Against Olaplex and Cosway

265.   Plaintiffs hereby incorporate and restate the above allegations by reference as though fully set forth herein.

266.   Defendant Olaplex designs, manufacturers, markets, distributes and/or sells the Products. Defendant Cosway designs and assists in the marketing of the Products.

267.   As discussed above in detail (i.e., use of ingredients that are harsh and

harmful, sensitizers, allergens and irritants, carcinogenic and/or that lead clogging of the hair follicle and related symptoms, conditions and infections), the Products are defective in design or formulation rendering the Products unreasonably dangerous with the foreseeable risks of harm far exceeding the benefits associated with the design or formulation. Defendants could have but chose not to design, manufacture and sell a safer alternative to the Products, which was feasible. On information and belief, Defendants made this choice in order to maximize profits—all to the determinant of Plaintiffs and other reasonable consumers.

268. The Products are defective due to inadequate and unsafe warnings/instructions for use of the Products, particularly Defendants failure to warn—and, in fact, their concealment—of its use of inferior, unsafe and ineffective ingredients, such use being at odds with Defendants' marketing of the Products. In addition, the Products are defective due to inadequate and unsafe warnings/instructions in that Defendants encouraged Plaintiffs and other reasonable consumers to use them to the exclusion of other brands of hair care products and to leave the Products on their skin in hair for long periods of time or indefinitely between washes. Similarly, Defendant's post-market warnings/instructions are inadequate and unsafe because, after Defendant knew or should have known of the risk of injury from the Products, Defendant failed to immediately provide adequate warnings/instructions to Plaintiffs and the public.

269.   The Products are also defective due to inadequate testing and study and/or the failure to act on or report the results of such tests and studies.

270.   As the direct and proximate result of the defective condition of the Products as produced, manufactured, designed, marketed, distributed and/or sold by Defendants, and of the negligence, carelessness, other wrongdoing and actions of Defendant described herein, Plaintiffs suffered damages.

## SIXTH CAUSE OF ACTION

### Unjust Enrichment

### All Plaintiffs Against Olaplex and Cosway

271.   Plaintiffs hereby incorporate and restate the above allegations by reference as though fully set forth herein.

272.   Defendant has been unjustly enriched in retaining the revenues derived from Plaintiffs' purchases of the Products, because the Defendant obtained  the benefits conferred by Plaintiffs without providing the Products having the characteristics and benefits promised.

273.   Retention of those moneys under these circumstances is unjust and Defendant falsely and misleadingly represented that the Products, Plaintiffs paid a price premium for the Products based on the false and misleading representations, and the Products did not have the characteristics and benefits promised and instead are rendered dangerous due to defects that cause hair loss, scalp issues and other

injuries. Plaintiffs have suffered injuries as a result.

274.   Plaintiffs would not have purchased (or paid a price premium) for the Products had they known of the defects that cause injuries.

275.   Defendants' retention of the non-gratuitous benefits conferred on it by Plaintiffs is unjust and inequitable, and because equity and good conscience requires restitution, Defendants must pay restitution to Plaintiffs for its unjust enrichment, as ordered by the Court.

## **ATTORNEYS' FEES, EXPENSES AND COSTS**

276.   Plaintiffs hereby incorporate and restate the above allegations by reference as though fully set forth herein.

277.   Plaintiffs have been forced to secure the assistance of counsel to protect their legal rights and mitigate their damages as a result of the Defendants' wrongful conduct.

278.   Having made proper presentment and provided actual and sufficient notice of their claims to Defendants, Plaintiffs seek recovery of their reasonable attorneys' fees, expenses and costs pursuant to all applicable statutes, regulations and agreements.

## **PRAYER**

WHEREFORE Plaintiffs pray for Judgment against Defendant as follows:

For an award of actual and consequential damages according to proof;

For an award of punitive damages according to proof;

For restitution in the form of disgorgement of Defendants' ill-gotten profits;

For an award of reasonable attorneys' fees, costs and expenses incurred herein;

For an award of pre- and post-judgment interest; and;

For all other relief to which they may be justly entitled.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand trial by jury under Fed. R. Civ. P. 38.

Dated: March 2, 2023

Respectfully submitted,

LAW CENTER OF AMY E. DAVIS, LLC

By:   /s/ *Amy E. Davis*
Amy E. Davis (*admitted pro hac vice*)
1021 N. Bishop Ave.
Dallas, TX 75208
adavis@cdfirm.com

GORDON & PARTNERS, P.A.

Steve Calamusa (*admitted pro hac vice*)
Geoff S. Stahl (*admitted pro hac vice*)
Rachel Bentley (*admitted pro hac vice*)
4114 Northlake Blvd.
Palm Beach Gardens, FL 33410
Telephone: 561-799-5070
SCalamusa@fortheinjured.com
GStahl@fortheinjured.com
RBentley@fortheinjured.com

MURPHY ROSEN LLP

David E. Rosen (SBN 155385)
Email: drosen@murphyrosen.com
100 Wilshire Boulevard, Suite 1300
Santa Monica, California  90401-1142
Telephone:  (310) 899-3300
Facsimile:  (310) 399-7201

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on the 2ND day of March 2023, I served the foregoing document

on all counsel of record via ECF.

By: */s/ Amy E. Davis*_____